# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: August 14, 2026

| | | |
|---|---|---|
| JOSEPH DWECK, | * | |
| Petitioner, | * | No. 20-193V |
| v. | * | Special Master Young |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

*David J. Carney*, Green & Schafle, LLC, Philadelphia, PA, for Petitioner.
*Naseem Kourosh*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On February 24, 2020, Joseph Dweck ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"). 42 U.S.C. § 300aa-10 et seq. (2018); Pet., ECF No. 1. Petitioner alleged that he developed Guillain-Barré syndrome ("GBS"),[2] which was caused-in-fact by a tetanus, diphtheria, pertussis ("Tdap") vaccine he received on July 15, 2019. *Id.* Respondent argued against compensation, asserting that Petitioner has not established by preponderant evidence his condition was caused-in-fact by his July 15, 2019 Tdap vaccination. Resp't's Response, ECF No. 53.

A careful analysis and weighing of all the evidence presented in this case in accordance with the applicable legal standards[3] reveals that Petitioner has failed to provide preponderant

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] GBS is a "rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." *Guillain-Barré Syndrome*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=110689 (hereinafter, "DORLAND'S").

[3] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record

evidence that the Tdap vaccine he received on July 15, 2019, caused him to suffer from GBS. Accordingly, Petitioner is not entitled to an award of compensation.

## I. Procedural History

Petitioner filed his petition on February 24, 2020. Pet. Petitioner filed medical records, the Pre-Assignment Review ("PAR") Questionnaire, and a statement of completion on March 6, 2020. Pet'r's Exs. 1–6, ECF No. 6; ECF Nos. 7–8. Petitioner then filed additional medical records and a statement of completion on May 1, 2020. Pet'r's Ex. 7, ECF No. 9; ECF No. 10. Further medical records were filed on May 26, 2020, and January 25, 2021. Pet'r's Ex. 8, ECF No. 14; Pet'r's Ex. 9, ECF No. 20.

Respondent filed his Rule 4(c) report, opposing compensation, on February 22, 2021. Resp't's Rep., ECF No. 21. On August 9, 2021, Petitioner filed an expert report from Omid Akbari, Ph.D., his curriculum vitae ("CV"), and supporting medical literature. Pet'r's Exs. 10–11, Pet'r's Ex. 12 (Tabs a–z), Pet'r's Ex. 13 (Tabs a–z), Pet'r's Ex. 14 (Tabs a–i), ECF No. 24. Respondent filed responsive expert reports from Harry Schroeder, M.D., Ph.D., and Raymond Price, M.D., on December 22, 2021, along with their CVs. Resp't's Exs. A–D, ECF No. 27. Petitioner filed additional medical records on January 10, 2022. Pet'r's Exs. 15–16, ECF No. 28. Respondent filed supporting medical literature for his expert reports on February 10, 2022. Resp't's Ex. C (Tabs 1–4), ECF No. 29. Petitioner filed a responsive report from Dr. Akbari and additional medical literature on March 10, 2022. Pet'r's Ex. 17, Pet'r's Ex. 18 (Tabs a–i), ECF No. 30; Pet'r's Ex. 18 (Tabs j–s), ECF No. 31; Pet'r's Ex. 18 (Tabs t–z), Pet'r's Ex. 19 (Tabs a–c), ECF No. 32. The same day, Petitioner also filed an additional report from Joseph Jeret, M.D., along with his CV and supporting literature. Pet'r's Exs. 20–21, Pet'r's Ex. 22 (Tabs a–h), ECF No. 33; Pet'r's Ex. 22 (Tabs i–r), ECF No. 34; Pet'r's Ex. 22 (Tabs s–w), ECF No. 35. Respondent then filed additional medical literature for Dr. Schroeder's initial report on March 15, 2022. Resp't's Ex. A (Tabs 1–11), ECF No. 36. Respondent filed supplemental reports from Dr. Schroeder and Dr. Price on August 30, 2022. Resp't's Exs. E–F, ECF No. 37.

On December 14, 2023, I issued an order scheduling an entitlement hearing for January 14–15, 2025. ECF No. 40. Petitioner filed additional medical records on June 25, 2024. Pet'r's Ex. 23, ECF No. 42. Respondent filed additional medical literature and updated CVs for Dr. Schroeder and Dr. Price on September 5, 2024. Resp't's Ex. E (Tabs 1–19), ECF No. 44; Resp't's Ex. F (Tab 1), ECF No. 45; Resp't's Exs. G–H, ECF No. 46. Petitioner filed additional medical literature and his pre-hearing brief on October 1, 2024. Pet'r's Exs. 24–48, ECF No. 51; Pet'r's Br., ECF No. 52. On October 2, 2024, I issued a Non-PDF Order rescheduling the entitlement hearing for January 27–28, 2025. Non-PDF Order, docketed Oct. 2, 2024. Respondent filed his pre-hearing brief on November 29, 2024. Resp't's Response. Petitioner filed additional medical records on December 24, 2024. Pet'r's Ex. 49, ECF No. 55. Respondent filed additional medical literature between December 27, 2024. Resp't's Ex. I (Tabs 1–2), ECF No. 56; Resp't's Ex. J (Tabs 1–5), ECF No. 57. Petitioner filed his pre-hearing reply brief, an additional report from Dr. Akbari, and

---

evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

supporting medical literature on December 30, 2024. Pet'r's Ex. 22 (Tab x), Pet'r's Exs. 50–68, ECF No. 59; Pet'r's Reply, ECF No. 61. Petitioner filed additional medical records on January 9, 2025, and additional medical literature on January 21, 2025. Pet'r's Ex. 69, ECF No. 64; Pet'r's Ex. 70, ECF No. 65.

An entitlement hearing was held on January 27–28, 2025. Min. Entry, docketed Jan. 28, 2025; Tr. Petitioner filed presentations from Dr. Jeret and Dr. Akbari on February 18, 2025. Pet'r's Exs. 71–72, ECF No. 69. No post-hearing briefs were filed. *See* Non-PDF Order, docketed Mar. 11, 2025. Petitioner later filed additional medical records on June 10, 2025. Pet'r's Exs. 73–74, ECF No. 79.

This matter is now ripe for consideration.

## II. Factual History

At the time of the vaccination at issue, Petitioner was 52 years old with a relevant medical history of coronary artery disease, hypertension, hyperlipidemia, myocardial infarction, and obesity. Pet'r's Ex. 3 at 41–45, 52–58. On June 3, 2019, he saw his primary care physician ("PCP") with complaints of cough, nasal congestion, and dizziness. *Id.* at 45. His assessment included an upper respiratory infection ("URI") notation. *Id.* at 50. Petitioner returned to his PCP to follow up on his chronic conditions on July 15, 2019. *Id.* at 52. He noted "a long history of deviated septum, sinus issues, and post nasal drip and [requested] a referral to [ear, nose, and throat ("ENT")]." *Id.* He received a Tdap vaccination during this visit. Pet'r's Ex. 1 at 1.

On August 4, 2019, Petitioner went to the emergency department ("ED") at New York University Langone and noted his Tdap vaccination two weeks prior. Pet'r's Ex. 4 at 6. He described "intermittent [right] hand paresthesias and difficulties with balance," although he did not immediately seek medical attention at symptom onset. *Id.* Petitioner explained how his symptoms had worsened over the past week and complained of "floppy legs," and "tingling in his hands and feet." *Id.* An examination showed upper extremity ("UE") and lower extremity ("LE") strength at 5/5, with an unsteady gait. *Id.* at 13–14. Due to concerns about GBS, Petitioner was admitted and referred for a neurology consultation. *Id.* On August 5, 2019, Petitioner was seen by neurology. *Id.* at 18. The examination revealed ptosis of the right eyelid and a small pupil, which Petitioner reported was not a new symptom. *Id.* Petitioner's sensation was normal, and his motor examination showed mild distal leg weakness. *Id.* The reflexes were absent in the LEs and 1+ UEs. *Id.* The impression was "most likely early GBS given his complaints and the recent vaccination." *Id.* Petitioner's treatment plan included "[magnetic resonance imaging ("MRI")] of the spine given Horner's syndrome[4] to make sure there was no cord process. If Horner's was unrelated, then GBS is mostly (sic)." *Id.* Additional testing was ordered. *Id.*

Petitioner was started on intravenous immunoglobulin ("IVIG") pending completion of studies, physical therapy ("PT"), and occupational therapy ("OT"). Pet'r's Ex. 4 at 19–28. A brain MRI showed no cord compression, with mild degenerative changes at the cervical and lumbar

[4] Horner syndrome is the "sinking in of the eyeball, ptosis of the upper eyelid, slight elevation of the lower lid, constriction of the pupil, narrowing of the palpebral fissure, and anhidrosis and flushing of the affected side of the face." *Horner Syndrome*, DORLAND'S.

levels without canal or neuro-foraminal narrowing. *Id.* at 9. An MRI of the spine showed no cord compression or cord signal abnormality, no evidence of abnormal enhancement, and mild degenerative changes at the cervical and lumbar levels without spinal canal or neuro-foraminal narrowing. *Id.* There was also a disc bulge at L5-S1, along with some other degenerative findings. *Id.* Petitioner continued care with neurology during his hospital stay. *See generally id.*

The diagnosis of GBS was confirmed via an electromyogram ("EMG") study performed on August 6, 2019. Pet'r's Ex. 4 at 67. The MRI studies were reassuring, and Petitioner continued to treat with IVIG. *Id.* at 57–63. The impression was GBS with mild asymmetric weakness in distal lower extremities, and old Horner's syndrome. *Id.* at 57–58. Petitioner developed a headache on IVIG and was reduced to half doses. *Id.* at 67. He had some areas of improvement while sensation abnormalities were more defined. *Id.* By August 8, 2019, the neurologist noted his examination showed "mild decreased position sense abnormality in distal LE" and "mild left anterior tibial weakness," but was otherwise normal. *Id.* at 73. At discharge on August 9, 2019, Petitioner was "alert and oriented [with] full strength today except 4+/5 left anterior tibial strength, normal position sense. Reflexes trace right ankle and absent left ankle." *Id.* at 4. He was discharged home with outpatient PT. *Id.* at 6.

On August 22, 2019, Petitioner saw neurologist Elina Zakin for a consultation for neuromuscular weakness secondary to acute inflammatory demyelinating polyneuropathy ("AIDP") (GBS). Pet'r's Ex. 5 at 14. He reported that his IVIG treatment took some time to be effective but now he has better balance and uses a cane. *Id.* Petitioner was taking gabapentin but tingling in his extremities persisted, and he felt fatigue. *Id.* An examination showed that he was neurologically intact, had UE/LE strength at 5/5, and his sensation was intact to light touch; additionally, vibration was reduced in the toes but intact in the hands. *Id.* at 14–18. Petitioner's reflexes were 1+ in his UEs and absent in the LEs. *Id.* He had a positive ganglioside panel. *Id.* The impression was AIDP (GBS). Ex. 5 at 18.

Petitioner again saw Dr. Zakin on September 10, 2019, and complained of persistent burning and tingling in his hands and feet made worse with activity, such as typing and texting. Pet'r's Ex. 7 at 48. His wife noted that on September 6, 2019, Petitioner "had a [five]-min[ute] episode of right facial weakness that self-resolved while in PT." *Id.* at 51. An examination revealed a noted improvement of sensory deficits in the distal extremities, but the areflexia in lower extremities persisted. *Id.* Dr. Zakin advised Petitioner to get urgent imaging for evaluation of a possible transient ischemic attack[5] given his history of vascular risk factors and was counseled to seek emergent medical attention should acute neurologic deficits develop. *Id.*

Petitioner was readmitted to NYU Langone from October 2 to October 8, 2019. Pet'r's Ex. 4 at 316–20. He went to the ED on October 2, 2019, with complaints of "[two] weeks of worsened gait and paresthesias in his hands and feet," with more severe "persistent numbness/tingling in the hands/toes" that "[was] starting to travel more proximally up to the ankles," similar to his initial hospitalization in August. *Id.* at 318. Neurology was consulted and noted a history of two weeks of difficulty walking while using a cane, paresthesias in hands and feet, and dropping items. *Id.* His paresthesias had increased from a seven to a nine in severity and was progressing proximally

---

[5] A transient ischemic attack is "a brief attack (from a few minutes to an hour) of cerebral dysfunction of vascular origin, with no persistent neurologic deficit." *Transient Ischemic Attack*, DORLAND'S.

up to the ankles. *Id.* Neurology recommended admission for IVIG and an EMG/nerve conduction study ("NCS"). *Id.* at 321–24.

Petitioner continued to follow with neurology during his hospital stay. Pet'r's Ex. 4 at 350–52, 356–58, 369–73, 376–79. The impression remained GBS/ADIP, characterized by numbness/tingling of the arms and legs. *Id.* at 334. He was given IVIG and had PT/OT. *Id.* at 334–38. An EMG on October 4, 2019, showed findings consistent with acquired sensorimotor demyelinating polyneuropathy, with involvement of the right facial nerve also (left side not assessed). *Id.* at 322. The record warned that the results "cannot be used to distinguish between AIDP and [chronic inflammatory demyelinating polyneuropathy ("CIDP")[6]]," but noted that this involvement of the facial nerve was more often seen with GBS. *Id.* at 322. By October 8, 2019, Petitioner had clinically improved with IVIG treatment and was discharged home. *Id.* at 316–20.

On October 24, 2019, Petitioner saw Dr. Zakin to follow up for his GBS. Pet'r's Ex. 5 at 34. He had some improvement of extremity paresthesias, was taken off of gabapentin, and started on Cymbalta. *Id.* A repeat EMG "revealed progression of previously noted acquired demyelinating disease, with presence of prolonged facial nerve distal motor latencies, which supports diagnosis of AIDP more so than CIDP." *Id.* Petitioner reported that tingling persisted in his hands and feet but was down from 10/10 to 3/10 in severity. *Id.* He still had fatigue and could only work three hours before needing to rest. *Id.* He was neurologically intact, had normal motor strength, had sensation intact to light touch, and vibration intact in the UEs and reduced in the LEs. *Id.* at 34–37. His reflexes were 1+ in the UEs, absent in the right LE, and trace in the left LE. *Id.* at 37. The impression remained AIDP (GBS). *Id.* The plan was for PT/OT, increased dosage of Cymbalta, and to return in four weeks. *Id.*

Petitioner returned to Dr. Zakin for a follow up on November 12, 2019. Pet'r's Ex. 7 at 44. His tingling had improved with Cymbalta and continued PT. *Id.* Petitioner also reported returning to work. *Id.* Dr. Zakin's impression remained the same, and Petitioner was to continue with Cymbalta and PT. *Id.* at 44–47. From November 12, 2019 to February 25, 2020, Petitioner received six IVIG treatments at his home. *Id.* at 6–10, 13–22.

During an April 21, 2020 telehealth visit with Dr. Zakin, Petitioner reported that he had "overall improved" since his last IVIG treatment, though he was still fatigued, had UE tremors, and was also feeling "more aggressive and impatient." Pet'r's Ex. 15 at 15–16. He also reported tinnitus that had worsened over the prior year, as well as photosensitivity. *Id.* at 16. On June 22, 2020, Petitioner returned to Dr. Zakin in person. Pet'r's Ex. 23 at 91. He reported continued intermittent tingling, worse in the hands than the feet; some unsteadiness and tipping over, but no falls; improved fatigue; and continuing tinnitus. *Id.* On July 20, 2020, Petitioner reported "recurrence" of bilateral hand and foot paresthesias that were not relieved by Cymbalta. Pet'r's Ex. 15 at 24. Dr. Zakin noted "[n]ew complaints of recurring extremity paresthesia despite [C]ymbalta" and ordered a cervical spine ("C-spine") MRI. *Id.* at 27. She also noted that there was a pending order for a brain MRI, which she had placed earlier for tinnitus but which Petitioner had

[6] CIDP is "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs and enlargement of the peripheral nerves, usually with elevated protein in the cerebrospinal fluid." *Chronic Inflammatory Demyelinating Polyneuropathy*, DORLAND'S.

not yet done. *Id*. From July 28 to July 30, 2020, Petitioner received IVIG at home. Pet'r's Ex. 9 at 9–16.

On August 24, 2020, Petitioner returned to Dr. Zakin, reporting that the IVIG had improved his paresthesias but had caused side effects, including fatigue, headache, and increased blood pressure. Pet'r's Ex. 15 at 28. He also reported continuing tinnitus. *Id.* Dr. Zakin reviewed Petitioner's August 6, 2020 MRIs, including a C-spine MRI (for AIDP) that showed no definite change since August 5, 2019, and a brain MRI (for tinnitus). *Id.* at 4. Dr. Zakin noted "[o]ngoing bil[ateral] tinnitus of unclear etiology" with an MRI that was "grossly unrevealing;" she referred Petitioner to audiology. *Id.* at 32. On October 26 and 28, 2020, Petitioner received IVIG at home. Pet'r's Ex. 9 at 7–8, 39–40. On December 7, 2020, Petitioner returned to Dr. Zakin, reporting intermittent tingling and unsteadiness, but stated that he was able to get through his work day (with his work being mostly remote at that time). Pet'r's Ex. 15 at 36–37. He also reported persistent tinnitus, which was "annoying." *Id.* at 37.

From August 22, 2019, through December 7, 2020, Dr. Zakin's examinations of Petitioner showed reduced sensation (light touch, pinprick, temperature, and vibration), reduced reflexes (in the UEs and LEs), and gait abnormalities – all to varying degrees and with fluctuations between visits. Pet'r's Ex. 5 at 16–17 (August 22, 2019); Pet'r's Ex. 7 at 50–51 (September 10, 2019); Pet'r's Ex. 5 at 36–37 (October 24, 2019); Pet'r's Ex. 4 at 46–47 (November 12, 2019); Pet'r's Ex. 23 at 56–57 (December 24, 2019); Pet'r's Ex. 15 at 10–11 (February 4, 2020); Pet'r's Ex. 23 at 94 (June 22, 2020); Pet'r's Ex. 15 at 26–27 (July 20, 2020); Pet'r's Ex. 15 at 30–31 (August 24, 2020); Pet'r's Ex. 15 at 34–35 (September 29, 2020); Pet'r's Ex. 15 at 38–39 (December 7, 2020). By December 7, 2020, however, Petitioner reported to Dr. Zakin that his reflexes had completely normalized. Pet'r's Ex. 15 at 39–40.

On March 16, 2021, Petitioner returned to Dr. Zakin, reporting that he had received a COVID-19 vaccination and also contracted a COVID-19 infection, and that his paresthesias had intensified (rated as 4–5/10) since his COVID-19 infection. Pet'r's Ex. 15 at 40–41. He also reported that subtle tremulousness in his bilateral UEs had become more pronounced. *Id.* at 41. Dr. Zakin advised Petitioner to adjust his dose of Cymbalta. *Id.* at 44–45. On July 1, 2021, Petitioner saw Dr. Zakin, where he reported "feeling well overall" since his last visit and walking on his own, but not doing formal PT. *Id.* at 45–46.

On August 10, 2021, Petitioner returned to Dr. Zakin to follow up on a message he sent the night before. Pet. Ex. 15 at 50. The message reported instability and increased tingling. *Id.* That day, he reported worsened LE paresthesias, soreness in the distal feet, and being "more wobbly" recently. *Id.* Petitioner's three previous physical examinations had shown normal reflexes but abnormalities in sensation and/or gait. *Id.* at 39 (December 7, 2020), 43 (March 16, 2021), 47–48 (July 1, 2021). However, his August 15, 2021 examination showed reduced LE reflexes, in addition to sensation abnormalities. *Id.* at 53. Dr. Zakin performed a fourth EMG/NCS in office, which showed acquired sensorimotor demyelinating polyneuropathy, with interval progression from the study performed on February 4, 2020. *Id.* at 55–57. She changed Petitioner's diagnosis to CIDP, though her assessment still noted "AIDP following vaccination," and she planned to restart IVIG. *Id.* at 54. On September 14, 2021, Petitioner received IVIG at home. Pet'r's Ex. 16 at 4, 40.

On October 4, 2021, Petitioner returned to Dr. Zakin, reporting prominent fatigue, difficulty tolerating the IVIG, persistent hand and feet numbness, trouble gripping objects with both hands, episodic unsteadiness, and weight gain. Pet'r's Ex. 15 at 58. Dr. Zakin noted Petitioner's "diagnosis of AIDP following vaccination in August 2019," but noted he "presents for CIDP (complaint of worsening extremity paresthesias)." *Id.* at 60. She advised holding off on further IVIG, given the side effects, and recommended PT/OT. *Id.* at 62. On December 7, 2021, Petitioner saw Dr. Zakin, reporting persistent paresthesias in his feet that did not interfere with his day-to-day activities, ongoing efforts to wean his Cymbalta dose, and continued weight gain, with plans to start Ozempic. Pet'r's Ex. 23 at 242. Like the October visit, the examination at this visit showed tremulousness and some reduced reflexes, but it differed from all past visits in that sensation was normal. *Id.* at 223, 244–45.

On May 16, 2022, Petitioner returned to Dr. Zakin and reported doing well overall, with a marked reduction in paresthesias and without extremity weakness. Pet'r's Ex. 23 at 260. He stated that he had continued reducing his Cymbalta dose and was continuing to work unassisted. *Id.* His physical examination continued to show tremulousness and reduced bilateral ankle reflexes. *Id.* at 262–63. Dr. Zakin changed Petitioner's diagnosis back to AIDP. *Id.* at 264. On November 15, 2022, Petitioner saw Dr. Zakin, reporting persistent fatigue and paresthesias, which were worse in the LEs and the UEs. *Id.* at 278. He stated that he was still on Cymbalta but had stopped Ozempic for weight loss due to side effects. *Id.* His physical examination showed reduced light touch, temperature, and pinprick sensation in a stocking/glove distribution, as well as tremulousness and reduced bilateral ankle reflexes. *Id.* at 277. Petitioner saw Dr. Zakin on March 14, 2023, July 25, 2023, September 26, 2023, February 5, 2024, and September 9, 2024. Pet'r's Ex. 24 at 27–113. He continued to report waxing and waning paresthesia with ongoing fatigue, and his examinations continued to show sustention tremor, decreased sensation, decreased reflexes, and gait abnormalities, which fluctuated. *Id.* at 26, 30, 48, 51, 68, 70–71, 85, 87–88, 109, 111–12.

Progress notes from Petitioner's December 3, 2024 office visit with Dr. Zakin noted persistent numbness in soles of feet, prominent fatigue, and recent fall during travel. Pet'r's Ex. 49 at 1. Physical examination revealed "[m]ildly tremulous in UE on sustention," with "[l]ight touch, cold temp[erature] reduced to ankles and wrists, vibr[ation] intact in bil[ateral] UE, reduced to ankle in bil[lateral]," and "1+ [ankle jerk]s bil[ateral]." *Id.* at 3. At the end of the note, Dr. Zakin attached an addendum:

> In summer of 2021, given persistence of sensory symptoms, we changed diagnosis to CIDP with indication for IVIG at this time. Repeat IVIG therapy did not improve symptoms. At present, he carries the diagnosis of paresthesias with history of AIDP.

*Id.* at 5.

No further medical records relevant to Petitioner's claim have been filed.

## III. Petitioner's Affidavit and Testimony

Petitioner filed an affidavit on March 6, 2020, to detail the pain and suffering that he alleged was caused by his Tdap vaccination. Pet'r's Ex. 2. Petitioner stated that as of filing, he "continue[s]

to suffer from [] GBS and experience many of the residual symptoms of numbness, weakness, tingling, fatigue, facial droop, tinnitus, and several other recurrent symptoms that persist on a daily basis and affect [his] quality of life." *Id.* at ¶ 7. He identified four rounds of IVIG that he had to undergo and noted that his "symptoms are so severe that [he] will likely need future IVIG treatments." *Id.*

Prior to his vaccination, Petitioner described himself as healthy and normal. Pet'r's Ex. 2 at ¶ 9. He received the Tdap vaccine as precaution when his daughter became pregnant and he, along with his wife, became "soon to be grandparents." *Id.* Petitioner did not recall any reactions on the day of vaccination and "had no history of viral or bacterial infections of illnesses at this time." *Id.* at ¶ 10. The symptoms began five days later, when Petitioner "began to experience some loss of balance, and pins and needles in [his] legs, feet, hands and arms," that over days, "evolved into numbness and weakness in [his] upper and lower extremities." *Id.* at ¶ 11. Petitioner eventually went to the ED when he "could not keep [his] balance." *Id.* at ¶ 13. He returned to the ED in October and underwent physical and occupational therapy through the end of 2019. *Id.* at ¶¶ 17–19. In addition to the physical symptoms, Petitioner continues to struggle with irritability, anxiety, and difficulties completing activities of daily life. *Id.* at ¶ 18. Petitioner also noted that he is unable to work at his dry cleaning and laundry company, including "standing at the counter, typing, helping customers, processing orders, working on clothing items, using [his] hands in every facet of the job, and speaking with customers either in person or on the phone." *Id.* at ¶ 21. His limitations "prevent [him] from independently walking up and down the stairs, walking without assistance or assistive devices, holding objects or using [his] hands to do any manual labor, and performing all of the duties associated with [his] work at the dry cleaners." *Id.* at ¶ 23.

Petitioner's testimony was largely consistent with his affidavit. He acknowledged that he "had a post-nasal drip and a slight cough," but asserted that he had those symptoms "for many, many years, over 30 years." Tr. 16. Petitioner explained that he did not believe that he was suffering from a virus because he had been previously diagnosed by an ENT specialist with a deviated septum and told by and allergist that he suffered from "common allergens and pollens." Tr. 17. On the day of the vaccination in question, Petitioner testified that he "was feeling fine." Tr. 18. Immediately following his vaccination, and in the hours and days after, Petitioner had no pain, stating "it seemed normal." *Id.* Petitioner stated "within five to six days after the shot, [he] started to feel things in [his] feet and [his] hands, numbness and tingling feelings." *Id.*

Petitioner went on to describe his symptoms and treatment, including hospitalizations and care under Dr. Zakin. He testified that "[s]he always believed that the diagnosis was AIDP, but for insurance purposes and to kind of give the IVIG another [] chance, another shot to see if it would help [him], [he] believe[d] she changed it to CIDP." Tr. 32. He believed that Dr. Zakin restarted IVIG because he insisted feeling "that it was helping . . . [b]ut, again, it was unproven, and [] more psychosomatic." *Id.* When he did not improve and struggled with the negative side effects, Petitioner stated they stopped the IVIG treatments completely. *Id.* He further noted that "she never felt that [he] was having a relapse of GBS." *Id.* He reiterated that "she always felt that it was AIDP. The CIDP was really just for -- just a way of getting something covered that would not have been covered." Tr. 34. Dr. Zakin explained to him "that it's basically AIDP with lingering paresthesias, not CIDP, that the IVIG treatments never really worked to improve the condition, and that the

CIDP, that whole short episode, was really just insurance-related, to see if it would help at the time." Tr. 37.

On cross examination, Petitioner stated that he was sure that he had a flu shot but he could not recall when exactly, "because [he tries] not to take shots if [he] really do[esn't] have to." Tr. 45. He noted that he may have received some routine vaccines as a baby. *Id.* Petitioner also acknowledged on the date he received his vaccine, he complained of a "cough, runny nose, nasal congestion, and dizziness." Tr. 46.

## IV. Expert Reports

### A. Expert Qualifications

#### 1. Petitioner's Expert, Dr. Omid Akbari, Ph.D.

Dr. Akbari currently serves as a Professor of Allergy and Immunology at the Keck School of Medicine at the University of Southern California. Pet'r's Ex. 10 at 2. He received his Ph.D. in Cellular and Molecular Immunology at the National Institute for Medical Research in the United Kingdom and completed a post-doctoral fellowship at Stanford University. Pet'r's Ex. 11 at 1. Dr. Akbari has published numerous articles across several peer-reviewed journals, many of which relate directly to the field of immunology. Pet'r's Ex. 10 at 2.

#### 2. Petitioner's Expert, Dr. Joseph Jeret, M.D.

Dr. Jeret is a board-certified neurologist who currently is "employed by the Ichan School of Medicine . . . as an active physician in the department of neurology," in addition to being on staff at South Nassau Community Hospital and Mercy Medical Center. Pet'r's Ex. 20 at 1. Dr. Jeret received his M.D. from SUNY Health Science Center at Brooklyn, and completed his medical internship with the Maimonides Medical Center before returning to SUNY Health Science Center to complete his neurology residency. Pet'r's Ex. 21 at 1. Dr. Jeret also completed a clinical neurophysiology fellowship at SUNY Brooklyn. *Id.* He has "published extensively on many areas of neurology" and has "diagnosed patients with [CIDP] and [AIDP], often known as [GBS]." Pet'r's Ex. 20 at 2. Dr. Jeret also maintains a forensic practice with "over 700 cases performed for peer review" and "over 100 files on behalf of attorneys." *Id.*

#### 3. Respondent's Expert, Harry Schroeder, M.D., Ph.D.

Dr. Schroeder currently serves as a Professor of Medicine, Microbiology and Genetics at the School of Medicine at the University of Alabama at Birmingham, where he also serves as the Director of the Immunology program. Resp't's Ex. A at 1. He received his M.D. and Ph.D. in Cell Biology from the Baylor College of Medicine, and he is board-certified in internal medicine and clinical genetics. Resp't's Ex. G at 1, 4. Dr. Schroeder completed his medical internship and internal medicine residency at the University of Kentucky Medical Center, and completed a fellowship in medical genetics at the University of Washington Medical Center. *Id.* at 2. Dr. Schroeder's "expertise is on immunologic diseases, along with the genetic factors that drive these diseases." Resp't's Ex. A at 2. He has served as an editor of the *Clinical Immunology: Principles*

*and Practices* textbook since 2001, and he regularly treats immune-mediated diseases in his clinical practice. *Id.*

#### 4. Respondent's Expert, Raymond Price, M.D.

Dr. Price is a board-certified neurologist and neuromuscular specialist who currently serves as an Associate Professor of Clinical Neurology and the Director of Neurology Residency at the University of Pennsylvania. Resp't's Ex. C at 1. He received his M.D. from the University of Pennsylvania, where he also completed his medical internship, neurology residency, and fellowship in clinical neurophysiology. Resp't's Ex. H at 1. Dr. Price "regularly examine[s], evaluate[s], and treat[s] patients with a variety of neurological conditions," including CIDP and GBS. Resp't's Ex. C at 1. He has also co-authored a textbook on neurology and authored numerous publications, including "a review of distal symmetric polyneuropathy" and "a review of rare subtypes of peripheral neuropathy, which included CIDP and GBS." *Id.*

### B. Expert Opinions

#### 1. Dr. Jeret

Dr. Jeret authored an expert report that focused on Petitioner's diagnosis with an analysis of his medical records and condition. Pet'r's Ex. 20. He provided a neurological background of the nature of AIDP and CIDP. *Id.* at 2. Relying on the National Institute of Health[7] for support, Dr. Jeret wrote "CIDP is closely related to [GBS] and it is considered the chronic counterpart of that acute disease." *Id.* (citing Pet'r's Ex. 22(m)). Indeed, acute CIDP can mimic GBS, also a type of inflammatory demyelinating polyneuropathy. *Id.* Dr. Jeret emphasized that both conditions are immune-mediated, "not genetic, degenerative, infectious, or traumatic." *Id.* at 3. He continued that the disease could be axonal and affecting the nerve cell, or demyelinating as the name suggests and affecting the myelin sheath. *Id.* In the case of the former, nerve conduction studies can reveal "reduction in the amplitude of the recorded nerve response." *Id.* Damage to the sheath is reflected in reduced nerve conduction velocity. *Id.*

In his report, Dr. Jeret opined that Petitioner "satisfied the diagnostic criteria for GBS, not CIDP." Pet'r's Ex. 20 at 15. Specifically, Petitioner's subjective complaints, stable motor examination and EMG/nerve conduction velocity ("NCV") parameters do not support CIDP. *Id.* Dr. Jeret emphasized that Petitioner's illness course was monophasic with "no objective findings of late worsening on exam[ination] (strength remained normal throughout) or EMG." *Id.* at 13. Dr. Jeret expanded on his opinion reasoning during his testimony.

Dr. Jeret began his testimony by confirming Petitioner's GBS diagnosis. He explained that AIDP is the most common type of GBS. Tr. 105. He noted that Petitioner's treater, Dr. Zakin switched her diagnosis from AIDP to CIDP for a while, but "on the subsequent eight visits, she switched it back to AIDP." Tr. 100. Although Petitioner identified his symptom onset as five days,

---

[7] *Chronic Inflammatory Demyelinating Polyneuropathy (CIDP) Information Page*, NAT'L INST. HEALTH (last visited Mar. 10, 2022), https://www.ninds.nih.gov/Disorders/All-Disorders/Chronic-Inflammatory-Demyelinating-Polyneuropathy-CIDP-Information-Page.

Dr. Jeret suggested an onset of one week, based on the medical records. Tr. 101. "Five to six seems to be the most accurate and reasonable." *Id.* Dr. Jeret explained that in GBS cases, "regardless of what's going on physiologically, the diagnosis is a clinical one." Tr. 102. He added that sensation, balance, fatigue and headache are not indicators; "[i]t's really just weakness and loss or diminution of deep tendon reflexes." *Id.* Unlike CIDP, a lumber puncture is not needed to confirm diagnosis. *Id.* Additionally, vaccines and infection can be a trigger for AIDP, whereas "infection is not typically listed as a trigger" for CIDP. Tr. 104. Both conditions are autoimmune demyelinating diseases, and "only over time does it become clear that we're dealing with acute onset CIDP or acute CIDP, as opposed to just run-of-the-mill GBS with incomplete recovery." Tr. 105. An accurate CIDP diagnosis would require "prolonged onset over more than eight weeks or two or three relapses." *Id.* Dr. Jeret said that in cases of misdiagnosis, he "would say in retrospect it was CIDP from the beginning," as opposed to a progression from one illness to the other. Tr. 106. Dr. Jeret conceded that practitioners "just don't know, that it really was CIDP . . . [but] the nice thing about it is they're both treated with IVIG." *Id.*

In context of Petitioner's clinical presentation, Dr. Jeret asserted that the onset of his neuropathy was approximately six days post vaccination with "pins and needles in his legs, the numbness and weakness in his arms and legs, and loss of balance and difficulty walking." Tr. 114. The GBS diagnosis during his hospitalization was based on "new onset weakness with loss of reflexes. That was enough to make the diagnosis and enough for them to start IVIG as treatment." Tr. 116. This diagnosis was consistent with Petitioner's EMG, which showed "signs of demyelination, damage to the coating of the nerve." Tr. 117. This would result in distal motor latency and slowing of the nerve conduction velocity. *Id.* Dr. Jeret noted as an aside that Petitioner's treaters are "obviously treating causation to the vaccine." Tr. 118–19.

Because Petitioner returned to the hospital, Dr. Jeret sought to explain how to distinguish AIDP from acute onset CIDP. Tr. 123. He described the Medical Research Council ("MRC") scale for muscle strength and how it is applied to six muscles: arm abduction, elbow flexion, wrist extension, hip flexion, knee extension, and ankle dorsiflexion. Tr. 124. The maximum score would be five times six bilateral muscle groups (5x6x2) or 60 total. *Id.* A significant relapse is a total score decrease of five points. *Id.* Dr. Jeret noted that Petitioner's score in October of 2019 remained at 60 and would therefore not be indicative of a relapse. *Id.* Dr. Jeret pointed out that despite Petitioner's electrophysiologic abnormalities, "the involvement of [his] facial nerve is more commonly seen in patients with AIDP as opposed to CIDP." Tr. 125. More importantly, Petitioner's clinical presentation was consistent with ADIP, Dr. Jeret explained:

> [Petitioner's] nadir [] was documented at 20 days. He had weakness of multiple limbs. He had areflexia that was documented on day 20. He had no prior [URI] or gastroenteritis. He had no significant relapse. It was a monophasic illness. And to supplement it, we have an EMG that shows demyelination on day 22.

Tr. 128.

Dr. Jeret reiterated that Dr. Zakin's decision to "change[] her diagnosis back to AIDP [] was very reassuring." Tr. 129. He supposed that "her basis was on the change in EMG on one or possibly two nerves. And, again, that's not a loss of one point in five muscles on the MRC scale,

so there was really no basis" for a CIDP diagnosis. *Id.* Dr. Jeret referred to Dr. Zakin's notes that "[s]he found a new abnormality when testing the right tibial nerve and another abnormality when testing the sural nerve." Tr. 135. Dr. Jeret acknowledged that Petitioner's symptom onset, weakness, areflexia and "EMG with demyelination -- and that was necessary in the case of CIDP, not necessarily in the case of GBS, but that was present." Tr. 130. He lodged an objection with using EMG results to change an AIDP diagnosis to CIDP and asserted "issues with the EMG test as well." Tr. 135. Without the wave forms produced by the test, he is "left to rely on the doctor who's interpreting it." Tr. 137. As background, Dr. Jeret stated that AIDP and CIDP are demyelinating conditions that would indicate damage to the myelin sheath resulting in a slowed response; "[i]t doesn't cause a decrease in amplitude." Tr. 138. Petitioner's "response showed a latency of 4.8 milliseconds and an amplitude of 0.8 millivolts," indicating the response in his right tibial nerve was reduced in amplitude, but not slowed. Tr. 137. Dr. Jeret further criticized the EMG results because Dr. Zakin did not get a response at Petitioner's big toe when she stimulated the back of his knee, and she characterized this as a conduction block. Tr. 139. It would be unexpected "to have this degree of both axon loss, with the reduced amplitude, and conduction block, if it was done technically well would be completely unexpected in this patient who was clinically five over five and whose demyelinating features improved, evidenced by the improved latency." Tr. 140. Lastly, Dr. Zakin did an F-wave stimulation "at the ankle, . . . all the way up the leg, . . . passing through the knee, [then] the groin, turning around in the lumbar spine, [and] coming back down [all the way through] to big toe." Tr. 141. Dr. Jeret opined that the "beautiful response" from this test given the transmitted traveled through a conduction block twice is inconsistent electronically. Tr. 142. "It's inconsistent with the patient's clinical situation, and I wonder whether I would rely on her testing of that nerve on that day." *Id.*

Dr. Jeret did not believe that there was sufficient evidence of worsening to justify a diagnosis change. Tr. 149. While there was "[a] couple where things became slightly worse, the radial sensory conduction velocity [decreased and t]he sural amplitude -- now, remember, amplitude reflects the axon, not the myelin -- went from 13 to 8.4 . . . [t]here were, multiple areas that got better or normalized." *Id.* He testified that "[t]he only problem is that there was no progression beyond eight weeks or significant relapse[; a]nd, again, the strength was documented as being normal." Tr. 130.

Petitioner's IVIG treatment was also evidence, according to Dr. Jeret, that Petitioner did not suffer from CIDP. Tr. 151. He noted that a positive response to IVIG "is sometimes used retroactively to prove that a patient has CIDP." *Id.* Petitioner started at a perfect MRC sum score and remained there "so it's actually a reason to question a diagnosis of CIDP if IVIG does not improve the patient by at least five points." *Id.* Dr. Jeret concluded that Dr. Zakin "never really believed it was CIDP." Tr. 153.

In support of his contention that worsening weakness is the sole indicator of an AIDP patient's relapse, Dr. Jeret identified the Donofrio[8] article and Habib & Waheed[9] article. Tr. 187 (citing Pet'r's Ex. 22(d), Pet'r's Ex. 70). He clarified on cross examination that worsening subjective symptoms, EMG results, and reflexes are not indicative of a relapse. Tr. 189. The 2017 Donofrio article identified hallmark onset symptoms of GBS as numbness and weakness in the

---

[8] Peter Donofrio, *Guillain-Barré Syndrome*, 23 CONTINUUM 1295 (2017).

[9] Ali A. Habib & Waqar Waheed, *Guillain-Barré Syndrome*, 29 CONTINUUM 1327 (2023).

lower limbs. Pet'r's Ex. 22(d) at 3. The author discussed the "progression of symptoms, particularly weakness," as a key indicator for the consideration of the differential diagnosis CIDP. *Id.* The author went further, stating that "[o]ver time, the question of CIDP arises if the patient has a long protracted course of weakness." *Id.* at 13. This worsening of weakness is particularly diagnostic if it occurs "after an initial improvement or after stabilization following treatment with IVIG." *Id.*

The Habib & Waheed article, published in 2023, is a more recent, detailed discussion of GBS, including factors that distinguish the syndrome from acute CIDP. *See* Pet'r's Ex. 70. The authors explained that "additional features such as sparing of sensory nerves and transient enlargement of nerve roots or the vagus nerve may help differentiate GBS from acute CIDP." *Id.* at 19. They continued that "[n]ormalization of nerves on ultrasound studies, assessed [six] months from onset, may provide additional support for the diagnosis of GBS." *Id.* AIDP and CIDP patients may have similar electrophysiologic findings, but "patients with acute-onset CIDP are less likely to have autonomic nervous system involvement, facial weakness, a preceding infectious illness, or need for mechanical ventilation." *Id.* at 23. Sensory signs, including impaired vibration and sensory ataxia, are more likely in CIDP. *Id.*

**2. Dr. Akbari**

In his initial written report, Dr. Akbari explained that "the main functions of the immune system are to recognize and subsequently eliminate foreign antigens, to induce immunologic memory, and to develop tolerance to self-antigens." Pet'r's Ex. 10 at 7. Noting that little is known "how the vaccine activates the immune system," Dr. Akbari explained that "[i]mmunization with a vaccine, such as Tdap, causes a local inflammatory reaction that is mediated by cells of the innate immune system." *Id.* at 5. Two functions of the innate immune system are to recruit other immune cells via the release of cytokines and to activate the adaptive immune response through dendritic cells. *Id.* "Once activated, a dendritic cell will migrate to the lymph nodes and interact with B and T cells that recognize the presented antigen." *Id.* Dr. Akbari continued that T helper cells, Th1 and Th2, "develop into effector T cells and are known to help eliminate different types of pathogens." *Id.* at 6. Further, "Th1 cells have been reported to be elevated in patients and have a pathogenic role in GBS and multiple sclerosis [("MS")]." *Id.* In support of this contention, Dr. Akbari cited to Kebir et al.[10] *Id.* (citing Pet'r's Ex. 12(h)). With this article, the authors "sought to evaluate the frequency of [interferon[11] ("IFN")]-expressing Th17 lymphocytes in MS and [experimental autoimmune encephalitis ("EAE")], and study their recruitment into the central nervous system ("CNS")." *Id.* at 1. The article did not specifically examine Th1 and whether its elevation was present across multiple neuropathies. In fact, the authors acknowledged that "the precise role of the Th17 effector cytokine IL-17 in the initiation of EAE and MS remains controversial." *Id.* Further, to the extent the authors identified a pathogenic role of Th cells, they were able to tie the

---

[10] Hania Kebir et al., *Preferential Recruitment of Interferon-y-Expression Th17 Cells in Multiple Sclerosis*, 66 ANNALS NEUROLOGY 390 (2009).

[11] Interferon is defined as "glycoproteins that exert virus-nonspecific but host-specific antiviral activity by inducing the transcription of cellular genes coding for antiviral proteins that selectively inhibit the synthesis of viral RNA and proteins. Interferons also have immunoregulatory functions (inhibition of B cell activation and antibody production enhancement of T cell activity." *Interferon,* DORLAND'S.

increased cell counts to the specific symptoms of MS and the presence of lesions throughout the CNS. *Id.* at 12.

Dr. Akbari identified "[m]olecular mimicry [as] one commonly implicated mechanism that can initiate immunoreactivity and lead to autoimmune disease." Pet'r's Ex. 10 at 3. He explained that "when a foreign substance is started to express, either as sequence homology or structurally, a structure that can mimic immune cells, and then the immune cells started to see the same type of structure on the self, and it started to attack self." Tr. 227. Dr. Akbari asserted that there are several articles that suggest "some similarities in sequence or sometimes structures of some of the microorganisms that is capable of inducing the immune cells to initiate a deactivation of macrophage and T cells." Tr. 230. In addition to microorganisms, vaccinations such as flu and "COVID-19 and the three type of vaccines and pneumococcal vaccine [are] also very much capable of caus[ing ] GBS." *Id.*

Dr. Akbari asserted the immune system's promiscuity allows for molecular mimicry via structural and sequence homology. Tr. 232. He explained that "[o]ften the T cell receptor cannot see the antigen directly." *Id.* However, if there is structural homology, "you can have two different sequences which is creating the same type of structure that engaged that T cell receptor in a three-dimensional way which can stimulate that type of T cell." *Id.* It can also lead to adverse effects and autoimmunity. *Id.* He noted that "there are multiple steps that needs (sic) to be failed for full development of autoimmunity." *Id.* Dr. Akbari provided examples of pathological molecular mimicry that occurs due to sequence homology "for example, in the case of several flu vaccines and several viral infections." *Id.* Pathological molecular mimicry via structural homology can be seen "in the case of Campylobacter jejuni expressing very similar structure to GM1 of gangliosides and causing GBS." *Id.* He added that "even if you have a sequence homology, . . . and [] structural mimicry in a normal, healthy biological system -- they have to pass regulatory T cell or immunoregulatory pathway. These are the last gatekeepers that often suppress any kind of unwanted immune responses." Tr. 233. These regulatory T cells are stimulated in response to immune system activation following immunization or infection. *Id.* They "protect us, and some of them hopefully become memory cells." Tr. 234. Relating this back to Petitioner, Dr. Akbari noted that at a peak of five to seven days, the regulatory system needs to "come and switch off the immune response[,] because if it stay[s] on, it can cause chronic infection." *Id.* In support of his assertions regarding the inflammasome and regulatory T cells, Dr. Akbari stated that he filed the Anderton & Liblau[12] and Li et al.[13] articles. Tr. 236–37 (citing Pet'r's Ex. 13(n), Pet'r's Ex. 13(p)).

Dr. Akbari asserted that the balance between effector and regulatory T cells are key for a healthy immune system. Tr. 237. He referenced the Li et al. article and stated that demyelinating conditions "are a type of Th1 and Th17 type of immune response." *Id.* He continued that "IL-17 and IL-22, which is also another subset produced after [IL-17], are abundant or very much present in [GBS]." Tr. 238. In healthy individuals, "effector T cells in GBS need to outnumber T regs, and often they are Th1 and Th17." *Id.* The Li et al. article's introduction noted that "the exact immunological mechanism of GBS remains not understood." Pet'r's Ex. 13(p) at 1. The authors asserted that previous studies showed increased numbers of IL-17 and IL-22 in MS, rheumatoid

---

[12] Stephen M. Anderton & Roland S. Liblau, *Regulatory T Cells in the Control of Inflammatory Demyelinating Diseases of the Central Nervous System*, 21 CURRENT OP. NEUROLOGY 248 (2008).
[13] Shujuan Li et al., *IL-17 and IL-22 in Cerebrospinal Fluid and Plasma Are Elevated in Guillain-Barré Syndrome*, 2012 MEDIATORS OF INFLAMMATION 1 (2012).

arthritis, inflammatory bowel disease, psoriasis, and Crohn's disease. *Id.* at 2. They noted that "[a]lthough IL-17 and IL-22 have been extensively studied in multiple inflammatory and autoimmune diseases, their correlation with GBS ha[d] not been reported yet." *Id.* The study aimed to "evaluate the [cerebrospinal fluid ("CSF")] and plasma levels of these two cytokines at the acute phase of GBS, and to find out the correlations between these two cytokines and functional disability scales as well as various CSF parameters." *Id.* In their first human study of its kind, the "data showed that levels of IL-17 and IL-22 in CSF and plasma of GBS patients were obviously elevated compared with [healthy controls]." *Id.* at 4. The authors cautioned that notwithstanding "an elevation of IL-17 and IL-22 levels in GBS, [] the[ir] functional roles [] require further investigation." *Id.* They did deem it "safe to conclude in our study that the extensive network of IL-17 and IL-22 in coordination with these inflammatory cytokines is associated with the pathogenesis of GBS." *Id.* They "might be important effectors in addition to Th1 cells and Th1 cytokines in autoimmune-mediated responses in GBS." *Id.*

Dr. Akbari "concluded that the theory of molecular mimicry supports that a Tdap vaccination can plausibly cause an adverse immune cross reaction and result in the onset of acute demyelination and development of GBS." Pet'r's Ex. 10 at 4. Dr. Akbari cautioned that the evolution of molecular mimicry has led to inconsistent and confusion use "in published medical and research literature." *Id.* He sought to clarify his use of the word molecular mimicry and how it can be applied to vaccine-induced disease pathogenesis. *Id.* For present purposes, "molecular mimicry is defined as the mechanism by which an immune stimulated response by infection or other method, i.e. vaccination, can trigger cross-reactive antibodies or T cells that cause the symptoms of autoimmune disease." *Id.* Dr. Akbari acknowledged that "the ability to show this direct link and scientific evidence in the pathogenesis of an autoimmune disease is rare," and asserted that previous metrics to implicate molecular mimicry were incorrect. *Id.* He continued the identification of significant sequence-specific homology is no longer necessary, and "[i]nstead conservation of only a few crucial residues can allow for cross-reactivity of immune cells." *Id.* at 5. Dr. Akbari argued that "[m]olecular mimicry has been shown to occur even in the absence of any true sequence or structural homology, generally believed to be because of the level of degeneracy necessary for the human immune system to recognize such an infinite number of foreign antigens." *Id.* at 9. T cell recognition of "different peptides in the context of different human leukocyte antigen (HLA) molecules" is, according to Dr. Akbari, "[a]nother level of possible cross-reactivity." *Id.* He also noted that "an adjuvant (or a booster) is a component that potentiates the immune responses to an antigen/vaccine and modulates it towards the desired immune responses." *Id.*

Dr. Akbari added that "the role of structure mimicry and regulatory pathways such as regulatory T cells are now added to molecular mimicry, as these two play an important role in induction of autoimmunity." Pet'r's Ex. 10 at 5. In support of this contention, Dr. Akbari cited to the Kohm et al.[14] article, which discussed the "[g]rowing evidence [of] the pathogenic role of CD8+T cells," specifically, "within MS lesions [that] may damage the nervous system." Pet'r's Ex. 12(d) at 3. While the focus of the article is indicative in the title, *CD8+ T Cells in Multiple Sclerosis,* the authors noted that "these cells play an important role in other proven autoimmune diseases including rheumatoid arthritis, type 1 diabetes, autoimmune thyroiditis, vitiligo, and

[14] Adam P. Kohm et al., *Mimicking the Way to Autoimmunity: An Evolving Theory of Sequence and Structural Homology*, 11 TRENDS MICROBIOLOGY 101 (2003).

inflammatory bowel disease." *Id.* at 2. Other factors can also play a role in someone's susceptibility to autoimmune disease. *Id.* Dr. Akbari testified that "[g]enetic predisposition is always involved in any kind of autoimmunity." Tr. 239.

Dr. Akbari testified that the Tdap vaccine is capable of causing GBS because "there are components of toxoids in there with the capability to bind to gangliosides." Tr. 220. Specifically, that the tetanus toxoid is able to bind to the gangliosides that are targeted by antibodies in GBS patients. Tr. 221. Dr. Akbari explained that Petitioner does have the relevant antibodies, but that GBS is "predominantly [] cell-mediated immunity, orchestrated by T cells and macrophages." Tr. 222. He continued that Petitioner's symptom onset was five days post vaccination, which is consistent with the time it takes for B cell and T cell activation and antibody secretion. Tr. 223.

Vaccines help protect the body against disease, beginning with the innate immune responses and ultimately activating the adaptive immune system. Tr. 224. Dr. Akbari testified that:

> [Tdap] initially induces inflammasome[, b]ut after that, we start to see activation of adaptive immune responses, which is predominantly T cells as a fundamental pillar of autoimmunity. And then they started to provide help for other type of cells such as macrophages and B cells. B cells are (sic) start to produce antibodies[.] Macrophages start to get activated by T cell help, and they started to cause peripheral demyelination, and they started to attack the myelin.

*Id.*

Dr. Akbari explained the role of the inflammasome as the body's "machinery which is designed to detect any type of invaders." Tr. 225. He identified tetanus toxoid, diphtheria toxoid, pertussis antigens, and alum adjuvants as potential components of the vaccine that would trigger the inflammasome. Tr. 224. In turn, "they started to see macrophages and antigen-presenting cell at the site of injection, started to secrete interleukin 1." Tr. 225. Dr. Akbari argued that the effectiveness of the vaccine depends on inflammasome induction. Tr. 226.

In cases (like Petitioner's) where injury follows the administration of a particular vaccine, there is a process that leads to a finding of causation. Tr. 226. Dr. Akbari explained that they look at vaccination type, vaccination-injury proximity, the adverse effect, type of diagnosis, and communication between scientist regarding other cases. *Id.* "[T]he combination of maybe 30, 40, 50 different case reports, and then hopefully then it started to have a case control studies," to make a conclusion based on a rare event. Tr. 227. Dr, Akbari asserted that they "are at the stage right now," based on case reports and meta-analysis, "which suggests [] the Tdap is capable of causing GBS." *Id.*

Shifting back to structural homology, Dr. Akbari explained the importance of this concept when creating a tetanus vaccine. Tr. 241. Tetanus toxin must be converted to tetanus toxoid "to reduce the toxicity." *Id.* During this process, "many structural parts of it stay the same, and namely it is very important to preserve the overall structure, because what we want is that the immune system recognizes this is structure without having any -- experiencing any toxicity, like paralysis out of toxics." *Id.* Dr. Akbari argued that preserving the structure also preserved "the binding

capability to gangliosides." *Id.* He then presented his theory for how the tetanus component of the Tdap vaccine can cause GBS. Tr. 242.

Dr. Akbari began with the tetanus toxoid in the vaccine binding to gangliosides, "[a]nd then after that, dendritic cells started to get attracted to the site." Tr. 242. He explained that tetanus or diphtheria toxoids can be use to induce "a massive immune induction to [an] antigen which is bind (sic) to [it]. *Id.* If "the antigen presenting cell, predominantly dendritic cells, have started to present a part of the gangliosides to the T cell, and then these T cells are capable of activating T cell[, then they] started to produce cytokines." *Id.* Additionally, Dr. Akbari testified, "the T cell [does] not only activate macrophages but can -- is capable of activating B cell." Tr. 243.

In Petitioner's case, Dr. Akbari argued that we know there is activation of B cells, "[b]ecause we see measurement of antigangliosides, so presumably these B cells -- get activated, become plasma cell, and started to produce a variety of antiganglioside antibodies." Tr. 243. Ultimately, "the T cells at the site help the B cells. Antibodies started to attack the myelin, the gangliosides, and we started to see the process of demyelination or peripheral demyelination." *Id.* Finally, "there's a short period after this type of attack, the person has started to feel tingling, weakness, and all other symptoms described," by Petitioner and in GBS patients. *Id.*

Dr. Akbari discussed three articles during his testimony that he asserted support "this proposition that tetanus toxoid can bind to gangliosides." Tr. 244. He stated that the Yu et al.[15] article explained that "the heavy chain of tetanus toxins -- this is the part that stays stable in the process of toxin to toxoid -- is responsible for ganglioside binding." *Id.* The authors of the study, which centered on TeNT-Hc, a tetanus neurotoxin fragment and possible alternative to tetanus toxoid vaccine, hoped that their research "may help to enhance the understanding of the immunological mechanism of the TeNT-Hc antigen and to provide a theoretical basis and evaluation criteria for designing new subunit vaccines and epitope vaccines against tetanus." Pet'r's Ex. 14(b) at 5. TeNT, the neurotoxin, was found to bind to complex gangliosides, and the authors confirmed that "[t]his binding is mediated solely by TeNT-Hc." *Id.* at 4. They concluded that mutants of the studied protein chain that were designed to reduce ganglioside binding "did not affect the key amino acids to elicit strong antibody response and provide excellent protection against tetanus neurotoxin." *Id.*

The second article, Johnston et al.[16] showed that the heavy chain fragment of tetanus toxoid can be used to "fully immunize a biological system, and this is a specifically glycolipid GM1 and G1b is attracting these toxins at the site." Tr. 245 (citing Pet'r's Ex. 14(c)). Like Yu et al., Johnston et al. was focused on developing "effective delivery of toxin-like antigens which harbor protective epitopes and [noted] that traditional toxoid proteins may not be optimal antigens for skin immunization." Pet'r's Ex. 14(c) at 2. The authors concluded that a specific non-toxic fragment of tetanus toxin "was significantly more potent than TTxd in inducing tetanus toxin neutralizing

[15] Rui Yu et al., *A Conformational Change of C Fragment of Tetanus Neurotoxin Reduces Its Ganglioside-Binding Activity but Does Not Destroy Its Immunity*, 18 CLINICAL & VACCINE IMMUNOLOGY 1668 (2011).
[16] Louise Johnston et al., *Transcutaneous Delivery of Tetanus Toxin Hc Fragment Induces Superior Tetanus Toxin Neutralizing Antibody Response Compared to Tetanus Toxoid*, 5 HUMAN VACCINES 230 (2009).

antibodies." *Id.* at 5. They also noted that "[t]etanus toxin binds cell surface gangliosides and possibly a protein receptor, a process mediated solely through the Hc fragment." *Id.* at 2. The final article also "describe[d] how tetanus toxin bind to gangliosides described many years ago through the heavy chain." Tr. 245 (citing Pet'r's Ex. 48). The third article, Chen et al.,[17] did not mention tetanus toxoid. Pet'r's Ex. 48.

Dr. Akbari testified that Petitioner's medical records contained laboratory reports that documented elevated antigangliosides, specifically GM1, GD1a, and GD1b. Tr. 247. He asserted that immune cells react to the gangliosides, "[t]hen that cause[s] activation of T cells, that the T cell provide help for the B cells to produce the antibodies. And these antibodies are antigangliosides." Tr. 248. Dr. Akbari conceded that this is not direct proof that the Tdap vaccine is the cause of Petitioner's GBS, but "it is suggestive that antibodies are involved." *Id.*

Dr. Akbari continued to explain the connection between Tdap and GBS. Tr. 249. He explained that the Tdap vaccine is usually booster, "[a]nd then whenever we receive these boosters, we started to see that there are a variety of antibodies formation." *Id.* He referred to the Yuki et al.[18] article, which is "not talking about Tdap, but they are talking about how the gangliosides or other structures . . . [are] capable of inducing antibodies against GM1 and how this GM1 can subsequently attack and cause peripheral demyelination." *Id.* (citing Pet'r's Ex. 12(y)). In all cases of autoimmunity, "we have a lack of regulatory T cell[s] at some part of this process that cannot suppress this kind of unwanted immune response" to uncontrolled effector T cells, "then you start to see inflammation." Tr. 251–52. Inflammation happens in healthy individuals as part of a normal immune response as long as regulatory T cells normalize, "which usually happen[s] a few days after vaccination, and the balance of health what we observe is maintained." Tr. 252. In cases where regulatory T cells are suppressed by the inflammasome, there is no restoration of the balance and demyelination can occur. Tr. 252–53.

Even in cases where there is no evidence of antigangliosides, Dr. Akbari asserted that Tdap can cause GBS because "[i]t's a cell-mediated immunity, so we don't need antibodies present." Tr. 254. He explained that "the macrophages and T cells, in the absence of antibody, can destroy myelin[.] The T cell is a major part, not the B cell." *Id.*

Dr. Akbari explained that he sought to submit curated medical literature that was the most important to his theory of Petitioner's case. Tr. 256–57. He relied on case reports that reveal "a dysregulated immune response following that type of vaccination." Tr. 258. In the aggregate, as meta-analysis, researchers can see patterns that "make it a little bit more credible to see if there's any association." Tr. 259. Dr. Akbari discussed the Pan et al.[19] case report where "antigangliosides, are present, and actually the onset of disease was four-and-a-half days, very similar to [Petitioner]." Tr. 261 (citing Pet'r's Ex. 42). He noted that the authors "say that [whether the Tdap vaccine

---

[17] Chen Chen et al., *Gangliosides as High Affinity Receptors for Tetanus Neurotoxin*, 284 J. BIOLOGICAL CHEMISTRY 26569 (2009).
[18] Nobuhiro Yuki et al., *Carbohydrate Mimicry Between Human Ganglioside GM1 and Camylobacter Jejuni Lipooligosaccharide Causes Guillain-Barré Syndrome*, 101 PNAS 11404 (2004).
[19] Meichen Pan et al., *Guillain Barré Syndrome After Combined Diphtheria, Tetanus, and Acellular Pertussis (DTaP) Vaccine: A Rare Pediatric Case Report and Review of Literature*, 19 HUMAN VACCINES & IMMUNOTHERAPEUTICS 226119 (2023).

caused GBS] needs further exploration." Tr. 262. Such studies do not currently exist, and Dr. Akbari noted that although GBS is not as rare, "vaccine-induced GBS is very rare." Tr. 263–64.

On cross examination, Dr. Akbari confirmed that he did not have any training in genetics, epidemiology, or statistics. Tr. 279. He further confirmed that he was not a medical doctor, did not have clinical experience or training in neurology. *Id.* There was also a discussion on the applicability of the supporting literature that Dr. Akbari relied on. Tr. 282–98. He acknowledged that the that the articles that he filed explaining cell receptor recognition across proteins do not explicitly discuss pathological cross-reactivity. Tr. 284. He explained that the authors "are in the field of demyelination [and] is implied," because "they're just focused on recognition of T cells, and we know that T cells are important for autoimmunity." *Id.* The Dalakas[20] article is related to a different disease, myasthenia gravis, and does "not directly analyze the crucial residues, but they are talking about their downstream effect, which is the T helper differentiation." Tr. 285 (citing Pet'r's Ex. 12(e)).

### 3. Dr. Price

Respondent's expert neurologist, Dr. Price, testified that the proper diagnosis for Petitioner was CIDP. Tr. 329. In his supplemental written report, Dr. Price noted that his initial report characterized Petitioner's presentation as "consistent with either the AIDP variant of GBS with a treatment-related fluctuation or acute onset CIDP." Resp't's Ex. E at 5. He described how CIDP and GBS are similar, in that they are both autoimmune peripheral neuropathies that "affect nerves in a non-length-dependent pattern." Tr. 329. He then explained that the major difference is the time course. Tr. 330. GBS, he stated, is monophasic with symptoms manifesting "usually within an eight-week epoch of time." *Id.* Although there can be residual symptoms, there should not be "any new symptoms, new exam findings, [or] new needs for therapy outside of that eight-week epoch from symptom onset." *Id.* Dr. Price added that "anything that either progresses longer than eight weeks or after that initial event beyond eight weeks has a relapse would be consistent with a diagnosis of CIDP." Tr. 331.

Dr. Price identified "two main components [of GBS] which [are] weakness in bilateral limbs and areflexia." Tr. 331. However, in CIDP, Dr. Price argued that "it is more established that there are motor and sensory variants." Tr. 332. In support, he referenced the Habib & Waheed article, which identified a clinical subgroup of GBS wherein weakness is not prominent, and the condition is distinguished as a pure sensory variant. Pet'r's Ex. 70 at 5. The authors noted that sensory variants of GBS "do not meet the diagnostic criteria for GBS, [and] controversy exists over their inclusion as clinical GBS variants." *Id.* at 8. To address that controversy, Dr. Price cited to the Van den Bergh et al.[21] article that "says, [d]ifferent clinical presentation has been associated with CIDP with pure motor or sensory impairment or with distal multifocal or focal distributions." Tr. 335 (citing Resp't's Ex. C, Tab 3).

---

[20] Marinos C. Dalakas, *Future Perspectives in Target-Specific Immunotherapies of Myasthenia Gravis*, 8 THERAPEUTIC ADV. NEUROLOGICAL DISORDERS 316 (2015).

[21] P. Y. K. Van den Bergh et al., *European Federation of Neurological Societies/Peripheral Nerve Society Guideline on Management of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force of the European Federal of Neurological Societies and the Peripheral Nerve Society – First Revision*, 17 EUR. J. NEUROLOGY 386 (2010).

The Van den Bergh et al. article discussed "patients eventually diagnosed with CIDP who have an acute onset resembling [GBS]." Resp't's Ex. C, Tab 3 at 2. Seen in up to 16% of patients, this acute-onset CIDP "is likely if deterioration continues >2 months from onset or if ≥3 treatment-related fluctuations occur." *Id.* The authors explained that "[a]cute onset CIDP should be suspected in patients with GBS with prominent sensory symptoms and signs at presentation." *Id.* They characterized this as an atypical variant that is "rarely associated with multifocal central nervous system demyelination." *Id.*

> CIDP should be considered in any patient with a progressive symmetrical or asymmetrical polyradiculoneuropathy in whom the clinical course is relapsing and remitting or progresses for more than [two] months, especially if there are positive sensory symptoms, proximal weakness, areflexia without wasting, or preferential loss of vibration or joint position sense.

*Id.* at 3

Dr. Price argued that there is a consensus that in order to qualify for progressive polyneuropathy, "you don't have to have weakness. You can have positive sensory symptoms[,] areflexia without wasting[, or] vibration loss. These are all features that would be consistent with a relapse." Tr. 336.

Following his discussion of diagnostic criteria, Dr. Price moved on to Dr. Akbari's assertion about the significance of elevated ganglioside antibodies. Tr. 337. He noted that you can see elevated levels in normal patients, CIDP patients, and "patients with other peripheral nervous system disorders like vasculitis. *Id.* Dr. Price acknowledged that elevated ganglioside antibodies are more commonly seen in GBS patients. *Id.* However, he argued that they "lack specificity for any single diagnosis, and instead can be mildly helpful." *Id.* Dr. Price "wouldn't use the presence of ganglioside antibodies alone without the clinical characteristics to make a diagnosis of [GBS] or CIDP." *Id.*

The distinction between GBS and CIDP was also discussed in the context of treatment. Dr. Price explained that although both respond to IVIG and plasma exchange, "[f]or reasons we don't understand, [GBS] does not seem to respond to steroids, whereas CIDP often robustly responds to daily chronic corticosteroid administration." Tr. 337.

In Petitioner's case, Dr. Price noted that records from his August 4, 2019 hospitalization included a neurological examination with normal motor "strength in the upper extremities and normal strength in the lower extremities, except for one muscle, hip flexion." Tr. 342. According to MRC sum score metrics, Dr. Price argued that "based on this exam, [this result] does not meet that criteria" for GBS. Tr. 349. Petitioner exhibited one degree of weakness in one muscle and "so that wouldn't actually meet the [Habib et al.] criteria in its current -- on this exam." Tr. 343. He opined that "his sensation is normal at this point in time." *Id.*

Petitioner described his symptoms at the time of this hospitalization as near paralysis, but Dr. Price argued that at the time, "he's able to lift every limb against gravity, which would not be

consistent in my opinion with near paralysis." Tr. 345. While recognizing the seriousness and authenticity of Petitioner's condition, Dr. Price testified that his presentation was not suggestive of paralysis as he recounted or cataclysmic as Dr. Jeret opined. *Id.* GBS can be fatal in the most severe cases, with other catastrophic effects, including ICU intubation, paralysis, and weeks-long acute rehabilitation. Tr. 346. Comparatively speaking, Petitioner, "went home with outpatient physical therapy, which is not what you'd expect in either a cataclysmic process or a near paralysis process." *Id.*

Next, Dr. Price discussed Petitioner's EMG results during his August hospitalization. Tr. 347. He noted that the examination was conducted by the resident director at the hospital, Dr. Kurzweil. *Id.* Dr. Price observed that Dr. Kurzweil "doesn't even detect the right hip weakness, and she's a neuromuscular neurologist at the NYU Langone hospital caring for [Petitioner]." Tr. 348. He argued that this supports her opinion that "weakness was not a prominent version of -- at this moment in time." *Id.* Presentation notwithstanding, Dr. Kurzweil conducted an EMG "because they had clinical suspicion for an underlying demyelinating neuropathy." *Id.* Petitioner exhibited "one-plus deep tendon reflexes in the arms but trace in the lower extremities." Tr. 349. Dr. Price explained that at this point, "a large portion of [Petitioner's] presentation is currently based on what he's telling them, his symptoms, but not what they're finding from a motor strength perspective and what they're finding on their reflex exam." *Id.*

Petitioner's examination included two parts to measure sensory nerve and motor nerve conduction. Tr. 350.

> And in general, they have two parameters, amplitudes, . . . and then the other one is conduction speed, which can sometimes be covered in different ways, which can be just velocity, . . . can be latency because they're telling about different segments of the nerve, or it can be F-waves, as Dr. Jeret mentioned yesterday, which is telling about a third different segment of the nerve. So these are all different ways to measure speed.

*Id.*

To explain how to interpret Petitioner's examination results, Dr. Price first offered an analogy in non-medical terms for better understanding. Tr. 350. He borrowed Dr. Jeret's analogy comparing nerves to copper wires with protective coating. *See id.* "[T]he issue is if you damage the coating enough, you may secondarily injure the copper, even if your target was just the insulating cover to begin with." Tr. 350–51. Although AIDP and CIDP are characterized by demyelination, "a better term is demyelinating with or without secondary axonal injury, and almost -- most patients with [GBS] or CIDP will have secondary axonal injury." Tr. 351. Dr. Price agreed that amplitudes "are often a marker of axonal injury, but that doesn't mean that that doesn't happen in [GBS] or CIDP." *Id.* He argued that in GBS cases with secondary axonal injury, "you would expect them to have residual deficits." *Id.* This is consistent with Dr. Jeret's assessment that Petitioner had GBS "with residual paresthesias, residual symptoms, and that usually implies an underlying axonal injury." Tr. 352. In addition to amplitude, velocity and speed can likewise be altered with demyelination. *Id.* Dr. Price continued that nerve conduction is determined by two factors: insulation (myelin) and diameter size. *Id.* "[S]o, if you have axonal injury that affects large

axons, your velocity . . . will get slower," and the F wave measurement will be longer. *Id.* This means, according to Dr. Price, that when slowing in the axonal process is detected, "it can be hard to tell at that time with a little bit of slowing, is that an axonal or demyelinating." Tr. 353. Demyelination is definite in cases where the slowing is more than 30 percent. *Id.* Dr. Price argued that because Petitioner's results were just above that threshold, there is a suggestion of demyelination that warrants consideration, but it does not meet the criteria. *Id.* He also noted that while Petitioner's nerve conduction block at his ankle was suggestive, the finding was also not in the definite demyelinating range. Tr. 356.

Dr. Price noted that Dr. Jeret "did a great job describing" F waves, and in Petitioner's case, "we have prolonged F-wave latencies in the tibial nerve and a conduction block in the tibial nerve, so those are suggestive of possible bordering on definite demyelination." Tr. 356–57. Dr. Price added that there are no signs of motor axonal loss on Petitioner's EMG and his "needle EMG is basically totally normal." Tr. 360. His results are "strongly suggestive of a demyelinating polyneuropathy but doesn't meet the EFNS/PNS strict criteria, but I certainly would be telling my team that this looks like a demyelinating neuropathy, and we should treat him as such." *Id.* As of August 2019, Dr. Price testified that the appropriate diagnosis for Petitioner was GBS. Tr. 363.

Continuing on through Petitioner's medical history, Dr. Price referenced results from an August 22, 2019 examination documenting new weakness in the left hip and the left great toe, with increased reflex drop in the upper extremities, and argued Petitioner's condition "has continued to progress." Tr. 367. He continued, "[a]nd if we, again, take this visit, which is August 22, and we compare it to a July 20 start date, he's now beyond four weeks and is now reaching his nadir. So his nadir exam is outside of the four-week window for [GBS]." *Id.*

Additional evidence of worsening is apparent in records from the October 2, 2019 ED report. Tr. 369. Dr. Price noted his intake complaints of "numbness that is getting progressively worse," and "[s]imilar sensory deficits but not as extreme as the last time, but progression." *Id.* As of October, at over eight weeks, "we are now outside of what would be expected for a monophasic [GBS] presentation." *Id.* Coupled with Petitioner's additional complaints that his gait has been worsening for two weeks, that he needs a cane, and that it is harder to traverse stairs, Dr. Price described this period as a relapse. Tr. 370.

Petitioner's neurological examination revealed areflexia, which is "a hallmark of CIDP, a hallmark of demyelinating polyneuropathy, and is new," in Petitioner's case. Tr. 374. Dr. Price asserted that "this is a sign that there's profound, new proximal and distal sensory loss on [Petitioner's] examination. It's an objective finding, and it's suggestive of a non-monophasic demyelinating neuropathy." Tr. 374–75. He compared Petitioner's symptoms to the relevant factors. "More than two months, check . . . areflexia without atrophy. [] Check. And then . . . he has preferential loss of vibration sensation at the toes, ankles, and knees." Tr. 375. Dr. Price discussed the EMG findings and admitted that they were consistent with AIDP or CIDP, but he argued that "if you take it into the relapse that [Petitioner] is having with the new areflexia, the new joint -- the new vibration sensation loss, the new clinical symptoms he's describing, then that's what you would make this diagnosis, and this EMG would support a diagnosis of CIDP." Tr. 382.

Dr. Price's final point on CIDP vs. AIDP related to Petitioner's IVIG treatment from October 3 through October 7, 2019. Tr. 383. He stated Petitioner's treater, the vice chair of neurology, "decided that he needed recurrent treatment. So they thought he clearly had a relapse." *Id.* This treatment "reduce[s] circulating antibodies in the serum," which indicates a belief that Petitioner was suffering from an active immunologic response beyond eight weeks. Tr. 384. At this point, Dr. Price asserted that Petitioner "now likely has CIDP." *Id.* He noted that Petitioner's NYU Lagone physicians recorded that a "[l]umbar puncture discussed at length, given third relapse of symptoms." Tr. 388. Dr. Price was "not totally sure why the LP would be that helpful, but if it was persistently markedly elevated protein this far out, five months out, that might be suggestive of a diagnosis of CIDP." *Id.* He opined that Dr. Zakin diagnosed AIDP but was "treating him for CIDP. . . . If she thought this was AIDP, she should have stopped IVIG and evaluated him clinically." Tr. 389. By mid-August, Petitioner's symptoms were improving. Tr. at 391. Dr. Price testified that "if you were of the opinion that this was CIDP, this is evidence that your IVIG is working. If you're not of the opinion this is CIDP, this is evidence that he's having the natural improvement from a monophasic process." *Id.* Notably, this is when Dr. Zakin changed her diagnosis to CIDP. Tr. 406.

From August 2019 through July 2020, Petitioner continued to seek treatment and receive IVIG. Tr. 396. Dr. Price asserted that "this idea that he has [GBS] with residual symptoms should mean that he has exactly that, residual symptoms, which should be present from the time of the injury into perpetuity, whereas that's not exactly what's written here." *Id.* Instead, "[s]he says that he has recurrence of bilateral hand and foot paresthesias which would imply that there's a time where he does not have hand and foot paresthesias." *Id.* Despite this evidence of relapse and remission of symptoms and IVIG treatment through August 2021, Dr. Zakin returned to her previous AIDP diagnosis. Tr. 407. Dr. Price asserted that "[t]his makes no sense." *Id.* He explained that "[y]ou can prove that you have symptomatology outside of eight weeks, so you don't have a monophasic course, . . . you can be acute onset CIDP. But you cannot go backwards." *Id.* He conceded in his written report that Petitioner's nerve conduction studies do "not fulfil the criteria for a definite demyelinating polyneuropathy." Resp't's Ex. E at 9. Notwithstanding those test results, "the finding of new right tibial nerve conduction block in the nerve conduction studies performed on 8/10/21 is not consistent with a monophasic demyelinating process, such as GBS in 8/19." *Id.* Petitioner's last medical record from December 2024 reflects AIDP with a parathesias diagnosis, and Dr. Price did not "think that's supported in the medical record." Tr. 408. He would have diagnosed Petitioner with CIDP in remission. Tr. 410.

> I think he has had mostly, even from August of 2019 through -- I guess that was December of 2024, he's had sensory-predominant demyelinating polyneuropathy that is not monophasic, that's affected his activities of daily living and has been treated repeatedly with IVIg, consistent with a diagnosis of CIDP. [] He's had reflexes that have become hyporeflexic or areflexic, depending on which time we're talking about between -- and have gone -- have oscillated as they did between August of 2019 and October of 2018, and then oscillated again in late -- in between April or so of 2021 and August of '21, and then again back in 2024. So he's had evidence of -- you know, and then his sensory vibration sensation exam has also evolved over time outside of that eight-week epoch. So his symptomatology and his physical examination are not monophasic.

Tr. 409–10; *see also* Resp't's Ex. E at 9.

Dr. Price testified that Tdap cannot cause CIDP and that it is not clear that it can cause GBS. Tr. 418. He has never "had a patient who's had [GBS] within six weeks of their tetanus vaccine." Tr. 419. He conceded having "a conversation with patients about [GBS] who've had a flu vaccine and some temporal relationship between their [GBS] and the flu vaccine." Tr. 420. However, it does not come up with Tdap. *Id.* In Petitioner's case, Dr. Price noted a medical visit "for a[ URI] about six weeks prior to receiving the Tdap vaccine." *Id.* While Dr. Price did not attribute Petitioner's condition to the infection, he recogniz[ed] that there is not just a vaccine temporal relationship but potentially a[n] infectious temporal relationship as well." *Id.*

On cross examination, Dr. Price conceded that warnings for patients who developed GBS within six weeks of Tdap "would not exist if there wasn't some evidence of relationship." Tr. 423. He was questioned at length about the evidence to support his determination that Petitioner suffered from a relapse. Tr. 424–32. Dr. Price maintained that his opinion was based on the total clinical picture, including all medical records, therapy notes and subjective accounts from Petitioner to his treaters. Tr. 426. He acknowledged that Petitioner's treaters did not define any period of Petitioner's disease course as a relapse, nor did his CIDP differential diagnosis ever become definitive. Tr. 430.

**4. Dr. Schroeder**

In his written report, Dr. Schroeder stated that he would defer to neurologists with respect to Petitioner's diagnosis and that his written report was "focused on the immunology behind GBS." Resp't's Ex. F at 1. He asserted that "Dr. Akbari's attribution of vaccination with Tdap as the inciting cause of GBS in this patient appears to be based purely on temporal association." *Id.* at 6. He continued that "the theories of potential immunologic cross-reactivity between tetanus toxin and neural antigens are claimed, but no direct proof, or persuasive and reliable circumstantial evidence of cross-reactivity has been presented." *Id.*

Dr. Schroeder began his testimony by clarifying that he is "not a neurologist," and his opinion is not dependent on identifying which neurological condition that Petitioner has, GBS or CIDP. Tr. 472. He focused on the biological mechanism that Dr. Akbari presented. *Id.* Dr. Schroeder opined that Dr. Akbari provided an overview of basic immunology and neuroimmunology, "[b]ut he failed to provide a mechanistic hypothesis that links the treatment with the vaccine with the development of an autoimmune response in terms of either GBS or CIDP." Tr. 473.

As background, Dr. Schroeder explained that "occasion[ally], a case report will be incredibly important in terms of providing new clues to disease . . . But more often than not . . . [i]t's just a signal without a control." Tr. 473. Epidemiological studies, by comparison, are extensive, large-scale accounts of a population. *Id.* He cited one example, Tuttle et al.,[22] which is "a 1991 study to review the findings of a large active seven-month surveillance study for [GBS]

[22] Jessica Tuttle et al., *The Risk of Guillain-Barré Syndrome After Tetanus-Toxoid-Containing Vaccines in Adults and Children in the United States*, 87 AM. J. PUB. HEALTH 2045 (1997).

among 23.2 million adults older than 17 years of age" after their receipt of a tetanus-toxoid containing vaccine. Tr. 475 (citing Resp't's Ex. A, Tab 8). Dr. Schroeder noted that relative risk of .79 from the study was "[p]retty similar" to the background rate of .64. *Id.* The incidence rate is no more than what is "expected by chance alone." Tr. 478. He also referenced VAERS from 1990 to 2007, the 1994 IOM report[23] and other "papers published between 1950 and 2008." Tr. 476. The 1994 IOM report, "based on biological plausibility in a case report of relapsing illness in one patient, concluded that there was sufficient evidence from this case to suggest causality between tetanus toxoid and GBS." Tr. 477 (citing Resp't's Ex. E, Tab 14). However, Dr. Schroeder noted the committees' addition "that since the conclusion was not based on controlled studies, no estimates of incidence or relative risk were available." *Id.* A more recent article, published in 2021, is an Agency for Healthcare Research publication[24] that found "[n]o new evidence of increased risks since the prior 2014 report for adverse events following administrations of vaccines," including tetanus. Tr. 483 (citing Resp't's Ex. E, Tab 18). Ultimately, a person's genetic susceptibility would be the risk factor for GBS following tetanus toxoid administration. *Id.*

After discussing the available medical literature, Dr. Schroeder began his criticism of the mechanics of Dr. Akbari's theory. Tr. 486. He identified the elements of innate immunity, including neutrophils, monocytes, macrophages, inflammasomes, and toll-like receptors. *Id.* He then explained that "[t]here's also a part of the adaptive immune system that's a part of this innate response." *Id.* These are antibodies "generated very early in life that are actually driven by self-antigen." *Id.* They are able to cross-react with "exogenous bacteria, viruses, et cetera, and provide you with protection from B cells without a need for T cells and without a need for prior exposure." Tr. 486–87. Dr. Schroeder asserted that this process takes time because "here you're dealing with cells that generate their receptors through a complex process of gene rearrangement, express a very diverse repertoire of antigen-binding structures that can bind virtually anything under the sun." Tr. 487. As a result, they must be guarded against pathological self-reactivity. *Id.* While innate immunity begins immediately, the adaptive system "takes about three to five days for those cells to get organized and start." Tr. 488. A vaccine introduces a one-time exposure of foreign antigens to the immune system, while with infection, there is "a living organism inside your body[;] you have continuous production of the antigens." *Id.* Dr. Schroeder then clarified that "the immune system really doesn't recognize antigens. What it does is it recognizes epitopes on antigens." Tr. 489. In the case of a virus or bacterium, "it's a much more complex, chaotic process than what you get from just a vaccine." *Id.* He continued that a vaccine elicits "a rapid response in a very localized place. And when you get an infection, it's going to be in a broader anatomic location." *Id.*

Dr. Schroeder shifted his discussion to how molecular mimicry was developed to better understand why the immune system did not direct a hostile response to "every single microorganism that we're exposed to." Tr. 490. It turns out "that by sharing similarity in sequence and structure, then these pathologic organisms would be tolerated" to perform specific functions *Id.* In this way, molecular mimicry is very common for all life. *Id.* Eventually, scientists hypothesized that if this "can lead to tolerance, perhaps it can also lead to autoimmunity." Tr. 491. This theory was borne out with EAE, wherein a peptide that is similar to myelin is combined with

[23] Inst. of Med., *Adverse Events Associated with Childhood Vaccines: Evidence Causality* (Kathleen Stratton et al. eds., 2012).
[24] Ag. for Healthcare & Rsrch. Quality, *Safety of Vaccines Used for Routine Immunization in the United States: An Update* (Courtney Gidengil et al. eds., 2021).

an adjuvant, and "can [then] elicit an immune response against that peptide that then cross-reacts with the myelin and causes demyelination" in mice. *Id.* In humans, there is a molecular mimicry example "between a glycolipid on the surface of Campylobacter jejuni and a glycolipid on the white matter of peripheral nerves," causing GBS. Tr. 493. Dr. Schroeder testified that approximately 25 common autoimmune diseases "have been associated, to one extent or another, with molecular mimicry." Tr. 495–96. However, he cautioned, "that doesn't necessarily mean that the majority of people who have those particular diseases have suffered those diseases as a result of molecular mimicry." Tr. 496. Dr. Schroeder reiterated that genetic susceptibility would be the factor that causes pathological molecular mimicry to occur in some minority of cases of all the people who get infections. Tr. 497.

In all cases of molecular mimicry, there must be sequential and/or structural homology. Tr. 500. Dr. Schroeder explained the concept.

> The antigen is expressed on the surface of a molecule called the major histocompatibility complex molecule, which is like a pedestal sink. You have a pedestal which is attached to the surface of the cell. You have a sink which has a depression in it on which the antigen lies. And then the T cell receptor combines to both the edges of the sink and also to the peptide that's inside. So the peptide is going to have some of the side chains of the amino acids pointed down and attach[es] itself to the floor of the sink, to the sides, attaching itself to the sides of the sink, and pointed up. And what the T cell receptor is looking at are the peptides that are up. So if you have two molecules and they happen to share the same amino acids pointed up -- okay? -- that is an example of a sequence similarity. If you have, instead, not all the amino acids pointed up, but you have an amino acid on one side pointed up and on the other side pointed up. Maybe it's different in the middle. It's also a structural homology.

*Id.* Dr. Schroeder continued that even with homology, for pathogenesis "[y]ou need to have an adjuvant, something that will activate the innate immune system in order to get things to go." Tr. 501. This something, whether it is present in any given individual, "it's a case of luck really." *Id.* Dr. Schroeder explained that people's antigen receptor repertoires are "primarily germline[25] encoded." *Id.* The immune system engenders variation among populations, including family members, by "putting in nucleotide sequences into the antigen, that portion of the molecule that will define the antigen binding site." *Id.* Because the sequences are randomly inserted, "one individual may have this one particular type of T cell receptor with an antigen binding site that's not present in the other individual." Tr. 502. In all individuals, there is "a spectrum of binding affinity and avidity and the stability of the interaction between the antigen and the antigen receptor." *Id.* If there is no binding, the cells will eventually die off and if they "bind too tightly -- and that's a case of potential self-pathogenicity -- then those cells are [also] eliminated." *Id.* Dr. Schroeder called this process self-tolerance. Tr. 503. When self-tolerance is broken, e.g. by introducing an adjuvant, autoimmunity can occur. *Id.*

---

[25] Germline is defined as "the sequence of cells in the line of direct descent from zygote to gamete." *Germline*, DORLAND'S.

One difficulty that Dr. Schroeder described regarding autoimmune disease pathogenesis, is that some diseases are grouped together because they have similar phenotypes (not genotypes), and it is their treatment that connects them and not how they are caused. Tr. 507. For example GBS and CIDP are both demyelinating diseases with a common treatment, but the former is self-limited and the later continues. *Id.* Notably, prednisone works for CIDP, but not for GBS. Tr. 508.

Dr. Akbari identified gangliosides as sites for homology, and Dr. Schroeder testified that this is because they are "present on the surface of C. jejuni that appears to elicit cross-reactivity with T cells that can also respond to the ganglioside on the surface of the nerve." Tr. 509. Dr. Schroeder opined that "there's just enough structural similarity, and there's something about them that enables them to elicit this response in susceptible individuals." *Id.* He reiterated that the exact causation mechanism remains unknown and noted that epidemiological reports often reveal "a preexisting infection before the development of these polyneuropathies." Tr. 510. Dr. Schroeder acknowledged that antiganglioside antibodies are more commonly found in GBS than CIDP. *Id.*

Compared to an infection, the Tdap vaccine that Petitioner received, Boostrix, is even less likely to illicit a strong enough immune response to initiate an immune response than the Dtap vaccine that is given to children. Tr. 511. Dr. Schroeder explained that Boostrix is a vaccine designed for "adults who have presumably received all their childhood vaccines plus many have received one, two, three or whatever, however many more vaccinations as an adult." Tr. 514. The dose of active components is "low enough to initiate a memory response to the tetanus toxoid without -- while reducing the likelihood of getting a[ hypersensitivity] reaction" that commonly results from a stronger tetanus vaccination in a patient that is already fighting off a foreign antigen (hence the need for the vaccine). *Id.* Because this vaccine has a lower concentration of the tetanus, diphtheria, and pertussis, as well as the aluminum adjuvant, it is less immunoreactive. Tr. 515.

In addition to a hypersensitivity reaction, Dr. Schroeder explained that the Boostrix insert also identifies encephalopathy as a contraindication. Tr. 515. He continued that "[c]ontraindications are you shouldn't do it." *Id.* The insert includes a list of precautions, which "are you can do it, but you're taking a chance." Tr. 516. These include progressive or unstable neurologic disorders, GBS, and brachial neuritis. *Id.* The results of the clinical trials are also disclosed by the pharmaceutical company in post marketing materials. Tr. 517. They include local reactions, fever, and fatigue; GBS is not included. *Id.* These post-marketing experiences have a chronological order, but that "doesn't necessarily mean it's pathogenic." Tr. 518.

Dr. Schroeder then detailed how molecular mimicry can lead to pathogenesis. He testified that you need homology. Tr. 519.

> So what you're actually looking for is something that is similar but not identical, something that makes it different, even if it's one amino acid, one hydrogen group, one carboxyl group, so that -- because what you're dealing with is the intensity of the signal, intensity of the bond between the T cell receptor, MHC, and the peptide. If you have a portion -- an epitope from a bacteria that shares extensive sequence homology but is different in one amino acid, that difference could lead to a difference in the way -- in the intensity of the binding for the T cell, and you could end up with one that was in the range where you'll recognize that as abnormal and

> start creating effector T cells, activated effector T cells. And if there's enough similarity – it's not identity but similarity -- such that that T cell receptor can also bind to the self-antigen, then you'll cross -you will redirect the activity of the T cell from the pathogen to your own body, and that's how you get an autoimmune response.

Tr. 519–20.

In the case of the Tdap vaccine, "we're never given an indication of there being an epitope on the tetanus that is sharing molecular mimicry with any component of the surface of the nerve that could lead to the T cells attacking the nerve and causing demyelination." Tr. 520. Dr. Schroeder asserted that the nature of the tetanus toxoid component of the vaccine does not lend itself to this theory. Tr. 521. The toxin itself is designed to "bind to the glycolipid on the surface of the neuron, . . . then be able to enter the axon." *Id.* It functions by stopping the release of the neurotransmitters, meaning there is a constant signal wherein "your muscles are just super activated." *Id.* "Tetany means just constant activity, so you get kind of like lockjaw." *Id.*

Although Dr. Akbari did not provide specifics, Dr. Schroeder attempted to counter what he believed the theory to be. Tr. 521. He supposed "the tetanus toxin or toxoid [would] bind[] to the glycolipid," but he "didn't see any evidence where there was an epitope that was present on the tetanus toxin that was also present with high similarity on the nerve." Tr. 321–22. He concluded that if the toxin and the glycolipid "are ingested by the antigen-presenting cell, then when the antigen-presenting cell processes, they're going to take the protein" and cut it into pieces. Tr. 522. When expressed to a T cell, it is going to be presented unaltered "so it's a self-antigen, 100 percent identical to that same glycolipid that's on the surface of the neuron." Tr. 522–23. Dr. Schroeder wondered "where is the immune response, because you have tolerance to self." Tr. 523. The other issue that Dr. Schroeder had was the inability of the toxin, injected into the muscle captured by immune cell and transported to the lymph nodes, and the glycolipid to meet for cross-reactivity to occur. *Id.* "There is a small amount of glycolipid that's found in the blood, but it's very small." *Id.* He asserted that it would not be enough to "create a de novo antigen that would create an immune response." *Id.* Even if there was proximity for interaction, "in order to have activity, have to not only bind in one specific place, but have to bind in a specific way." Tr. 526. Finally, "it's not just binding. It's a whole host of factors as to whether or not something is going to be pathogenic." Tr. 523. Although "there's a suggestion that Th17 cells are playing a role in the pathogenesis[,] that does[n't] tell us anything about the etiology of the Th 17 response." *Id.*

## V. Legal Standards

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Rooks v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the

vaccine at issue caused the injury. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322, N.2 (Fed. Cir. 2010). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 837 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53. (Fed. Cir. 1999)); *see also Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. *Shyface*, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the Vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." *Flores v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 157, 162–63 (2014); *see also Stone v. Sec'y of Health & Hum. Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also as to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); *Pafford*, 451 F.3d at 1358–59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

### A. Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding his claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001)

("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.").

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng. v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them.").

**B. Causation**

To receive compensation through the Program, Petitioner must prove either (1) that he suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that he suffered an injury that was actually caused by a vaccination. *See* §§ 11(c)(1), 13(a)(1)(A); *Capizzano*, 440 F.3d at 1319–20. Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface*, 165 F.3d at 1352–53).

To prove an injury that was caused-in-fact by vaccination, Petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface*, 165 F.3d at 1352–53.

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological

mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical

conditions." *Kirby*, 997 F.3d at 1383. While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan*, 539 F.3d at 1352. Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VI. Analysis

### A. Diagnosis

The parties dispute the nature of Petitioner's injury, including diagnosis. In cases where diagnosis is contested, "special masters may find whether a preponderance of evidence supports any proposed diagnosis before evaluating whether a vaccine caused that illness." *Hibbard v. Sec'y of Health & Hum. Servs*, No. 07–446V, 2011 WL 1766033, at *6 (Fed. Cl. Spec. Mstr. April 12, 2011) (citing *Broekelschen v. Sec'y of Health & Hum. Servs.,* 618 F.3d 1339, 1345–46 (Fed. Cir. 2010)).

"[T]he opinions of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases." *Welch v. Sec'y of Health & Hum. Servs.*, No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019). An opinion by a treating physician that is not supported by a factual basis or other evidence is conclusory in nature. *Id.* And a "treating physician's recognition of a temporal relationship does not advance the analysis of causation." *Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012); *see also Robertson v. Sec'y of Health & Hum. Servs*, No. 18-554V, 2022 WL 17484980, at *17 (Fed. Cl. Spec. Mstr. Dec. 7, 2022) (finding treating physicians' statements of mere suspicion fall short of an opinion supporting vaccine causation); *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1347 (Fed. Cir. 2010) (concluding the special master did not err in affording little weight to the opinions of Petitioner's treating physicians where "none of the treating physicians concluded that the [] vaccine caused [Petitioner's condition]").

Here, the statements of Petitioner's treating physicians reflect consideration and reconsideration of his clinical progression throughout months and years of testing and evolving symptoms. I often rely heavily on these statements as Petitioner's treaters are "in the best position" to determine his injury and its cause. *See Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367 (Fed. Cir. 2009); *Capizzano*, 440 F.3d at 1326; *Cucuras*, 993 F.3d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence."). In this case however, the motive of Petitioner's primary neurologist has been tainted by Petitioner. Additionally, her expertise has been called into question by both Petitioner's and Respondent's experts. Petitioner testified that Dr. Zakin "always believed that the diagnosis was AIDP, but for insurance purposes and to kind of give the IVIG another chance," she changed his diagnosis to CIDP. Tr. 32. At best, Petitioner is asserting that Dr. Zakin ordered an expensive medical procedure, with possible side effects and knowing it was unhelpful, because a patient with no medical training asked her to. At worst, Petitioner is accusing Dr. Zakin of insurance fraud. Either way, the medical record is silent as to why Dr. Zakin changed her diagnosis from AIDP to CIDP and then back again. I will not infer malfeasance by a medical professional without probative evidence of such.

Petitioner's expert, Dr. Jeret, asserted that Petitioner's test results were inconsistent with a CIDP diagnosis and although he was reassured when she changed the diagnosis back to AIDP, he "wonder[ed] whether [he] would rely on her testing," given her interpretation of the results. Tr. 142. Dr. Price, Respondent's expert neurologist, asserted that despite an AIDP diagnosis, Dr. Zakin ordered treatment consistent with CIDP. He testified that "[i]f she thought this was AIDP,

she should have stopped IVIG and evaluated him clinically." Tr. 391. Dr. Price agreed with Dr. Zakin's CIDP diagnosis in October 2019, following what he characterized as a symptom worsening, specifically progressive numbness and similar sensory deficits outside of a monophasic GBS timeline. Tr. 369. He asserted that it makes no sense that Dr. Zakin returned to an AIDP diagnosis, because you cannot go backwards if you have symptomatology outside of eight weeks.

The fact that both experts are equally secure in their assessment of Petitioner's condition belies the irony of an attack on Dr. Zakin's competence. Perhaps she did not know and wanted to cover both of her bases. Perhaps she looked at Petitioner's progression and sincerely changed her mind. Her motives are not clear, and I will not attempt to discern them based on the conflicting opinions of the experts. Both experts rely on criteria to make their respective arguments for Petitioner's diagnosis. Both experts highlight factors consistent with their asserted diagnosis and downplay the necessity of those that do not support their opinion. Petitioner's presentation is certainly some form of inflammatory demyelinating polyneuropathy, however, whether it be acute-CIDP or GBS with treatment related fluctuations is something that even esteemed experts are unable to agree on. I am not a medical professional. I do not presume to be in a better position to diagnose a patient with a rare, atypical iteration of an uncommon condition. The evidence presented is not preponderant (more likely) for either condition; more importantly, the success of Petitioner's claim does not hinge on whether the diagnosis is AIDP or CIDP. He would be unsuccessful in either event. The matter of diagnosis need not be decided, because I do not find that Petitioner has presented preponderant evidence of general causation for GBS or acute-CIDP.

Despite the fact that I did not find preponderant evidence in the record for a definitive diagnosis, substantial parts of this decision in the medical record and expert section are devoted to arguments and analysis on the matter. I include that evidence and discussion to illustrate the difficulty that treaters face trying to diagnosis someone in real time without the benefit of the entire record, as well as the difficulty of Monday morning quarterbacking where reasonable people can disagree on the meaning of the same facts. I do not get into the minutia of identifying which criteria would be consistent with AIDP vs. CIDP, because both experts have conceded that Petitioner's presentation is atypical and contains aspects of both illnesses. A detailed description of this back and forth can be found above. Ultimately, Petitioner has not presented preponderant evidence that Petitioner's inflammatory demyelinating neuropathy was caused by his Tdap vaccination.

**B. *Althen* Prong One**

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3d at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223, (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support his theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6

(Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States,* 620 F.2d 255 (Ct. Cl. 1980))).

Such medical opinions regarding vaccine causation may also be found within a petitioner's medical record in the form of statements made by his treating physicians. *Holmes v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 469, 488 (2014) ("[T]here might be circumstances in which a treating physician's opinion itself provides an adequate basis to find *Althen* prong one satisfied, for instance by containing a reliable theory explaining how the vaccine caused the injury in question."); *Volger v. Sec'y of Health & Hum. Servs.*, No. 11-424V, 2014 WL 1991851, at *7 (Fed. Cl. Spec. Mstr. Apr. 25, 2014) ("Unquestionably a treating physician's observations and deductions have probative value in establishing a petitioner's theory for how a vaccine injured him."); *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, No. 18-925V, 2023 WL 6536207, at *28 (Fed. Cl. Spec. Mstr. Sept. 11, 2023). "For instance, a doctor's diagnosis could express a belief as to how the vaccination caused the particular injury." *Langland v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 421, 438–39 (2013) (citing *Capizzano*, 440 F.3d at 1326). However, the opinions of treating physicians are not "sacrosanct–that it must be accepted in its entirely and cannot be rebutted." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 745 n. 67 (2009). Rather, "evidence establishing the medical or scientific grounds upon which such conjecture could reasonably be based is needed." *Volger*, 2014 WL 1991851, at *7 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

The causation theory presented by Dr. Akbari does not always follow an easily discernible roadmap or natural progression of how the Tdap vaccine hijacks the immune system during routine inoculation to cause an autoimmune demyelinating polyneuropathy. Moreover, sections of Petitioner's reports sometimes digress to assert tangential arguments. This makes it difficult to provide a comprehensive and cohesive account of Dr. Akbari's asserted causation theory. Therefore, I will not attempt to do so. Ultimately, the disjointed arguments made by Dr. Akbari will be addressed in the order that he presented them. Even within this unusual composition, the parts do not make a whole. Although all of Petitioner's arguments have been reviewed and considered in the context of any filed supporting evidence, this decision will not explicitly discuss every assertion and every piece of literature. *Moriarty*, 844 F.3d at 1328 ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek*, 527 F. App'x at 884 ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

Dr. Akbari argued that Th1 cells are elevated in patients and have a pathogenic role in GBS. The medical literature that he cited, however, relates to MS, and the authors offered several caveats for GBS. They noted that although studies showed increased numbers of specific cytokines in MS, rheumatoid arthritis, and other conditions, "the exact immunological mechanism of GBS remains not understood." Pet'r's Ex. 13(p) at 1. The Li et al. article did not apply wholesale the MS findings to GBS and the authors cautioned that these elevated levels in GBS patients require further study. Dr. Akbari accurately characterized the probative value of his hypothesis by noting that molecular mimicry can plausibly explain vaccine-caused GBS.

Plausibility is not the standard, however. The Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon*, 941 F.3d at 1360; *see also Moberly*, 592 F.3d at 1322 (rejecting a "more relaxed standard" of whether the condition was "likely caused" by the vaccine and reiterating that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury ... is not the statutory standard"); *LaLonde*, 746 F.3d at 1339 ("However, in the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof.") (*quoting Moberly*, 592 F.3d at 1322). Petitioner suggested that the plain language of *Boatmon,* noting the consistent rejection a plausible theory standard, is not the point. While indeed that may not be the sole basis for the Circuit's determination that the special master applied the incorrect standard, Petitioner does not go so far as to represent that the Circuit adopt a plausibility standard. In fact, he conceded that plausibility is merely the floor and "recogniz[ed] the proffered plausible theory must also be a reliable one." Pet'r's Br. at 46 (citing *Sharpe v. Sec'y of Health & Hum. Servs.,* 964 F.3d 1072, 1085 (Fed. Cir. 2020)). Additionally, Petitioner's reliance on *Kirby* is misplaced. The decision does not mention a purported plausibility standard. Indeed, the Circuit uses the language from *Althen*, noting that the special master recited the correct legal standard. *Kirby,* 997 F.3d at 1384 ("[P]etitioners must provide a reputable medical theory . . . based on a sound and reliable medical or scientific explanation.").

Dr. Akbari acknowledged the difficulty in providing evidence of autoimmune disease pathogenesis. However, he argued that molecular mimicry has been long misunderstood and too narrowly considered. New research has shown that molecular mimicry can occur due to sequential or structural homology, and this new avenue for cross-reactivity is notable, given the promiscuity of T cells and their role in GBS development. While Dr. Schroeder did not disagree that structural homology can also lead to cross-reactivity, he again highlighted the lack of evidence that this occurs and GBS develops after a Tdap vaccine is administered. The articles that Dr. Akbari relies on focus on MS and do not assert the same findings of the pathogenic role of CD8+T cells in the development of GBS.

Dr. Akbari argued that there was homology between the tetanus toxoid and gangliosides on the surface of nerve cells, while Dr. Shroeder argued that "that a comparison of the structure of tetanus toxoid to the gangliosides associated with GBS fails to demonstrate structural similarities." Resp't's Ex. A at 6. Dr. Akbari cited studies he asserted document the high affinity binding of tetanus neurotoxin to neuronal gangliosides. *See* Pet'r's Ex. 38. Dr. Akbari stated that "[t]he manufacture of tetanus-containing vaccines is known to inactivate the toxin in a manner which leaves the native conformation of the protein stable." Pet'r's Ex. 10 at 15. One of the articles filed in support of his contention does not mention the toxoid. *See* Pet'r's Ex. 38. A second article noted that "[t]he relationships between the conformations of the ganglioside-binding site and the immunogenicity of TeNT-Hc need demonstration through further studies." *Id.* (citing Pet'r's Ex. 14(c)). The third article noted the binding affinity of TeNT-Hc and suggested an alternative vaccine may be preferred. Pet'r's Ex. 48. None of these articles mention the development of GBS or any autoimmune neuropathy as a by product of the binding affinity. Dr. Schroeder argued that the tetanus toxoid protein is not a ganglioside or similar enough in structure to a ganglioside "to elicit anti-ganglioside autoantibodies on the basis of molecular mimicry." Resp't's Ex. A at 7. There is no evidence in the record of structural similarity between tetanus toxoid and neuronal

gangliosides that elicits an autoimmune antibody attack on nerves cells that are bound to TeNT-Hc.

Both experts discussed the bacterial antigen C. jejuni and suggested that the robust immune response needed to fight of infection can lead to autoantibodies and corresponding autoimmunity. However, Dr. Schroeder noted that the Tdap vaccine has a low concentration of tetanus toxoid (lower than any infection and even the Dtap vaccine), because it is produced as a booster for adults and only needs to initiate a memory response. Dr. Akbari did not dispute this, instead he argued that the adjuvant added to Boostrix can facilitate the type of immune response needed.

Although molecular mimicry is an adaptive immune system process, Dr. Akbari argued that the inflammasome's response to the Tdap vaccine is what ignites the adaptive immune system and a series of events that ultimately leads to peripheral demyelination. Tr. 224. Dr. Akbari does not identify support in the medical literature that explains the potential role of the inflammasome in Tdap-induced GBS. His assertion is the equivalent of stating the Tdap vaccine generates an immune response, and without more, such a statement is insufficient to prove vaccine causation.

Petitioner's causation theory consists of a series of conclusions that depend on an unsupported premise: that cross-reactivity that occurs between the Tdap vaccine and human myelin is pathogenic and results in an inflammatory demyelinating neuropathy. Like the present case, in the past Dr. Akbari has made scientific conclusions without providing supporting evidence on numerous occasions. Indeed, Dr. Akbari has been warned repeatedly by special masters due to the overall lack of cohesiveness of his reports, the frequent mischaracterization of the literature he cites, and his habit of asserting scientific conclusions without providing any supporting evidence. *See e.g., Ampofo-Addo v. Sec'y of Health & Hum. Servs.*, No. 21-1231V, 2025 WL 2463643, at *19 (Fed. Cl. Spec. Mstr. July 31, 2025) (rejecting Dr. Akbari's theory for relying on conclusory statements, mischaracterizing medical literature, and lacking preponderant evidence); *Ray v. Sec'y of Health & Hum. Servs.*, No. 20-321V, 2025 WL 3900631, at *22–24 (Fed. Cl. Spec. Mstr. Dec. 12, 2025) ("Petitioner and her experts mischaracterize the medical literature to support their contentions . . . Dr. Akbari mischaracterizes the findings, adversely affecting his credibility and reliability of his opinions. This critique of Dr. Akbari is not new.") (citing *Powell v. Sec'y of Health & Hum. Servs.*, No. 20-1726V, 2025 WL 3443590, at *32 (Fed. Cl. Spec. Mstr. Oct. 8, 2025) ("Dr. Akbari mischaracterizes the medical literature he cites which further adversely affects his credibility and the reliability of his opinions.")); *Williams v. Sec'y of Health & Hum. Servs.*, No. 19-1269V, 2024 WL 5040482, at *43 (Fed. Cl. Spec. Mstr. Nov. 13, 2024) (rejecting Dr. Akbari's theory because "(1) his proffered ideas about causation lack development, (2) he suggests the adoption of [a] legal standard other than preponderant evidence, and (3) he mischaracterizes the findings of medical articles."); *Nieves v. Sec'y of Health & Hum. Servs.*, No. 18-1602V, 2023 WL 3580148, at *44–45 (Fed. Cl. Spec. Mstr. May 22, 2023) (Dr. Akbari's "theory amounts to a confusing, inter-related patchwork of contentions . . . . There were also several erroneous foundational contentions in Dr. Akbari's opinion."); *M.M. v. Sec'y of Health & Hum. Servs.*, No. 18-583V, 2024 WL 4164557, at *37 (Fed. Cl. Spec. Mstr. Sept. 12, 2024) (Dr. Akbari "misrepresents the literature he cites. . . . Dr. Akbari's expert report, . . . is a meandering discussion of various topics that do not relate to how the flu vaccine can exacerbate asthma. It is difficult to

understand and offers no cohesive theory that can be thoughtfully analyzed.").[26] As has been articulated several times in the Program, a special master is not bound to "the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)). I do not find Dr. Akbari's theory to be cohesive or reliable. Accordingly, Petitioner has failed to satisfy his burden pursuant to *Althen* prong one.

### C. *Althen* Prong Two

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted).

A successful argument pursuant to *Althen* prong two is heavily dependent on a reliable causation theory. Petitioner's inability to meet his burden demonstrating how the Tdap vaccine can cause an inflammatory demyelinating polyneuropathy effectively precludes him from being able to show that his symptoms were actually caused by the vaccine according to said theory. This hinders any meaningful discussion on prong two.

In determining whether molecular mimicry occurred in Petitioner's case, Dr. Akbari testified that his process to determine vaccine-injury causation involves considering the type of vaccine and timing between vaccine and symptom onset, specific injury and diagnosis type. Tr. 226. He also considered any other relevant cases presented by scientists and medical professionals. Dr. Akbari noted the presence of antiganglioside antibodies, indicative of a B cell, antibody-mediated response; however, his causation theory is based on T cell dysregulation that is characteristic of a cell-mediated response. While both can be present in the same person in response to the same antigen, Dr. Akbari's assertion that the T cells at the site help the B cells is not clarifying.

Dr. Akbari does not adequately address the medical record with a URI note a few weeks prior to Petitioner's vaccination. Petitioner complained of symptoms consistent with any infection in the weeks prior to his vaccination, but no specific infection was found. Respondent's experts assert this as a potential cause for the development of Petitioner's condition; however there is not much argument beyond statistical likelihood. Petitioner discounted this note and testified that he did not remember speaking to his provider about any potential illness. While Respondent does not have the burden to prove an alternative cause unless and until a petitioner establishes a prima facie case, said evidence can also weighed in the context of Petitioner's prong two argument for specific causation. After consideration of Petitioner's entire medical record in the context of the expert opinions, Petitioner has not provided preponderant evidence that his condition was caused by the Tdap vaccine pursuant to *Althen* prong two.

---

[26] Due to this history of repeated behavior and his performance in the present case, Dr. Akbari's fees will be addressed accordingly.

**D. *Althen* Prong Three**

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationship." *Id.* Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. CL. At 542; *see Pafford*, 451, F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does not constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. CL. At 356. (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury").

Dr. Akbari wrote that approximately five days, "the timing between receipt of the vaccine and development of GBS[,] is consistent with what is known about the timing of GBS resulting from vaccinations. Pet'r's Ex. 10 at 16. In response, Dr. Schroeder opined that an adaptative immune system response takes three to five days to start. Tr. 488. He acknowledged that in this case, there is a temporal association but argued that "is the only link between the Tdap vaccination and GBS in this [Petitioner]." Resp't's Ex. A at 8. Based off Dr. Akbari's reliance on molecular mimicry as a biological mechanism, the accepted timeframe for said process for Program, on-Table, flu-GBS cases, and Respondent's concession, Petitioner has provided preponderant evidence of an appropriate temporal relationship pursuant to his asserted theory. This is further evidenced by Dr. Schroeder's failure to contest this point. Therefore, Petitioner has presented preponderant evidence of medically acceptable temporal relationship consistent with molecular mimicry and as required pursuant to *Althen* prong three. However, Dr. Schroeder did assert that Dr. Akbari's "opinion is based on the complete lack of a compelling scientific basis for tetanus toxoid eliciting pathogenic anti-ganglioside antibodies, documentation of a respiratory infection in the [P]etitioner in the days prior to the vaccination, and the complete absence of epidemiological evidence[27] supportive of a causal link between GBS and vaccination with Tdap." *Id.* Indeed, as discussed above, Dr. Schroeder's assertions are supported by the record.

## VII. Conclusion

For the reasons discussed above, I find that Petitioner has not provided preponderant evidence that he developed GBS-AIDP nor that his inflammatory demyelinating condition was caused by his Tdap vaccination. Therefore, Petitioner is not entitled to compensation, and I must **DISMISS** his claim.[28]

---

[27] It bears repeating that Petitioner is not required to provide epidemiologic evidence to prevail. My use of Dr. Schroeder's accounting of what is missing from the record serves to show the totality of the gaps in potential evidence that could serve in whole or part, to meet Petitioner's burden.

[28] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master